Alice M. Smith, Respondent, v. Holdoway Construction Company, a Corporation; William J. Holdoway, J. G. Holdoway and W. A. Houston, as Trustees of said Holdoway Construction Company, a Corporation; William J. Holdoway, George R. Hunsche, as Trustee; J. B. Corn, Jr., and Mutual Bank & Trust Company, a Corporation, Intervenor, Appellants, and Peter F. Smith, Defendant.—129 S. W. (2d) 894.

Division One, June 14, 1939.*

*NOTE: Opinion filed at September Term, 1938, April 1, 1939; rehearings denied at May Term, 1939, May 2, 1939 and June 14, 1939.

*Robert E. Hannegan, Oliver Blackinton* and *Robert L. Aronson* for appellants, except intervenor.

*A. B. Frey* for appellant intervenor.

*Frank P. Ashemeyer, Montague Punch, Carl M. Dubinsky, A. B. Elam* and *Jerome F. Duggan* for respondent.

*Joseph J. Howard* for Peter F. Smith.

HYDE, C.—This is an action in equity to set aside a quitclaim deed from plaintiff and her husband to defendant Holdoway Construction

Company. The court's decree did cancel this deed, granted other relief sought, and made certain other orders hereinafter specifically stated. Defendants, except Peter F. Smith, plaintiff's husband, and intervenor (claiming rights under a deed of trust) have appealed.

Plaintiff's petition, as amended, sought cancellation of the quit-claim deed, and the subsequent trust deed of the grantee, on the ground that her signature thereon was obtained by fraud. She charged that her husband and William J. Holdoway, president and owner of all stock (except qualifying shares for directors) of defendant corporation, conspired to get title thus transferred so that her husband could obtain a divorce in another state and leave her without any rights in this land. The real estate conveyed was a valuable apartment building ($25,000 to $30,000 by defendants' evidence and double that on showing of plaintiff) in the City of St. Louis which was free from incumbrance at the time. The relief sought by plaintiff (in addition to a receiver and temporary restraining orders) was a decree "divesting said Holdoway Construction Company, its officers, trustees, directors, stockholders and creditors from any interest in and to said property, and to vest the title to said property, free of all liens and incumbrances, in the name of this plaintiff, and for such other orders touching the premises as may seem meet and proper."

Defendant Peter F. Smith filed an answer confessing his part in the fraudulent scheme, and stating that there was no consideration for the conveyance. He further alleged that "at the time of the transfer of said property mentioned in plaintiff's petition the Holdoway Construction Company and William J. Holdoway were severally and jointly indebted to this defendant in the sum of twenty ($20,000) thousand dollars; that said indebtedness has accumulated over a period of years, and that this defendant demanded an accounting from time to time from the respective defendants, Holdoway Construction Company and William J. Holdoway, and had never been able to obtain said accounting." His answer also contained a waiver of his sole right to the title, and asked for affirmative relief as prayed for in plaintiff's petition.

The answer of Holdoway and the other defendants denied fraud, denied that they or any of them took title as straw parties for Peter Smith, and alleged that at the time of the conveyance "Peter F. Smith was indebted to William J. Holdoway and Holdoway Construction Company in the net sum of $26,987.70, together with interest at the rate of 6 per cent per annum, in the amount of $8376.03, a gross amount due of approximately $35,313.73, and that said debt was the consideration for the execution of the quitclaim deed." These defendants sought affirmative relief in the alternative as follows: "That the quitclaim deed in evidence was given and accepted as in full payment of all the indebtedness of Peter F. Smith, defendant, due de-

fendant Holdoway Construction Company and William J. Holdoway; that the deed of trust herein described is a valid instrument and a lien upon the said real estate for the amount therein set out; and that the Court further find and decree that the plaintiff and the defendant Peter F. Smith have no right, title or interest in or to said real estate;'' or ''that the said quitclaim deed was in fact given as security for the indebtedness of the said Peter F. Smith, found to be due to said Holdoway Construction Company and William J. Holdoway, defendants; . . . ascertain and find the amount of said indebtedness and to decree that the real estate herein described is subject to the amounts found by the Court to be so due, together with interest thereon at the rate of 6 per cent per annum, and that the gross amount so found, less the amount of the deed of trust described herein, of $20,000 (placed on the property by Holdoway Construction Company), shall and does constitute a lien upon said real estate in favor of William J. Holdoway and Holdoway Construction Company. . . . And that the defendant Holdoway Construction Company shall execute and deliver to the plaintiff a quitclaim deed in favor of the plaintiff, conveying to her all the right, title and interest in said real estate which the Court shall find she, the plaintiff, has in and to said real estate, subject, however, to the deed of trust described herein and further subject to the lien of the balance due from Peter F. Smith to said Holdoway Construction Company and William J. Holdoway.''

Plaintiff's reply denied the indebtedness set up as consideration for the quitclaim deed, and denied the other affirmative statements of defendants' answer. The issues raised on intervention of the parties claiming under the trust deed will be discussed after consideration of the issues between the original parties.

The court's final decree (the first decree was set aside to permit intervention) found that there was fraud on the part of all defendants, except George R. Hunsche, trustee, in the procurement from plaintiff, on September 4, 1930, of the quitclaim deed; that there was no legal delivery of said deed; that no consideration passed; and that deed was never properly acknowledged, so that plaintiff is entitled to the relief prayed for ''on her own behalf, as well as cross relief urged and prayed for by the defendant Peter F. Smith on behalf of the plaintiff.'' It further found that the intervenor had no knowledge or notice of the fraud; and that, as an innocent holder for value, it acquired the note and deed of trust of Holdoway Construction Company for $20,000, later reduced to $15,000, described in the pleadings as collateral security for a debt due it from William J. Holdoway in the amount of $8500 and interest. The decree ordered defendants permanently enjoined from interfering with possession of the property by the plaintiff and Peter F. Smith, and the receiver was directed to deliver the property to them. The quitclaim deed was

declared "void *ab initio,* ordered canceled, of no force and effect, and for naught held, at all times, as a deed of conveyance of the property therein described." Title was ordered vested in the name of Peter F. Smith and Alice M. Smith, his wife, the plaintiff, as their exclusive property, free from all liens, except the lien of the intervenor, as pledgee, for $8500 and interest, but provided that if said amount was not paid within ninety days from final judgment after appeal, if any, the intervenor might apply to the Court for leave to foreclose and satisfy its lien. A judgment was rendered for $6882 in favor of plaintiff and Peter F. Smith and against Holdoway Construction Company and the trustees thereof. Another judgment was rendered in favor of plaintiff and Peter F. Smith against William J. Holdoway, individually, the Construction Company and the trustees thereof for $8500, plus interest of $85, making a total of $8585. Costs were adjudged against defendants, except Hunsche, trustee, and the intervenor, and the Court retained jurisdiction of the cause for the purpose of entering further orders.

Defendants contend that Peter F. Smith should not be awarded any relief because of his participation in the fraud which showed that he did not come before the court with clean hands, and that it was also error to decree that plaintiff had a greater right in the land than she had prior to the perpetration of the fraud. Defendants further contend that the proof of fraud was not sufficient to support the decree, and that the money judgments were not supported by evidence and were unauthorized because beyond the scope of the pleadings.

Plaintiff and her husband came to St. Louis about 1916 from Cuba. Mr. Smith had worked there for many years building railroad lines and doing other construction work. Smith said that when he came from Cuba he had about $32,000 as the result of his work there. He invested about $6,000 of this in a 157-acre farm at Alma, Illinois. He also invested part of his funds in St. Louis real estate and was able to resell some of it at considerable profit. About 1919, he began to do business with Mr. Holdoway. Their relations continued until 1934. During this period Holdoway handled a number of real estate transactions for the Smiths, including one for plaintiff and her brother, involving the investment of money received from her mother's estate. He also financed some of their deals by furnishing money on trust deeds. Smith did some building for Holdoway and they were engaged in other building operations together. In 1925, he purchased a lot on Cleveland Avenue in St. Louis, upon which during the next year he erected a large apartment building at the cost of more than $25,000. This deed was made to Peter F. Smith, but he left it in the possession of Holdoway instead of recording it. Holdoway claimed to have loaned Smith the money for the construction of the building and said that it was their intention to finance the matter by deed of trust, but that they left this to be done when the property was sold,

and no sale was ever made. The Smiths lived in the apartment from time to time but also lived on their farm in Illinois, on which they raised and sold fruit.

The Smiths had some domestic trouble during this period and Mr. Smith would leave home and be gone for several days without Mrs. Smith's knowing where he was. Smith said that he had decided in 1930 to get a divorce and that he asked Holdoway to take title to the Cleveland Avenue property until he obtained a divorce. He told Holdoway that he could get Mrs. Smith to sign a quitclaim deed to the Cleveland Avenue property by representing it to her as a trust deed to get money needed to carry on a business deal. He said: ''I told him to come out there and bring a deed prepared, and we would try and get her to sign it, and he permitted the use of his name in a straw name, to handle that property, when we had our divorce suit settled he would bring it back in my name or make disposition as we saw fit. . . . He was to hold it, the same as he was holding the original deed, which had never been recorded.'' Holdoway did get Mrs. Smith to sign a quitclaim deed to the Holdoway Construction Company. This deed was dated September 4, 1930. Acknowledgment was dated September 20, 1930. Holdoway recorded both deeds (the quitclaim and the original Cleveland Avenue deed of 1925 to Peter F. Smith) in June, 1931. About the same time he also recorded a trust deed, on the Cleveland Avenue property, securing a note for $20,000 executed by Holdoway Construction Company payable to J. B. Corn, an employee of Holdoway who was a straw party in this transaction. Smith said that he did not know that these deeds had been recorded until 1935, about the time this suit was filed. Smith filed a divorce suit in 1932 at Salem, Illinois. After Mrs. Smith employed lawyers to defend the suit he dismissed it. Then, in March, 1933, he went to Little Rock, Arkansas, for the purpose of establishing a residence so that he could get a divorce there. He filed a suit for divorce in Arkansas in June, 1933. Up to that time, the Smiths remained in the possession of the apartment and their son at times occupied one of the apartments. They had a resident manager in charge who rented the apartments, collected the rents and accounted therefor to them. Smith paid for repairs and paid telephone bills, coal bills, gas bills and light bills out of the rents. Such bills continued to be charged to him up to the time this suit was commenced. Mrs. Smith frequently collected some of the rent money from their manager, up to 1933, and used it for personal expenses.

Mrs. Smith said that at the time she signed the quitclaim deed she did not know that her husband was contemplating a divorce. On the day it was signed, she was in the orchard at the farm where they were picking fruit for shipment to market.. She said that Holdoway drove up and said he was in a big hurry and wanted to know where Mr. Smith was. He went on to the house to find Smith and came back with

his signature on the paper he had. She said that Holdoway told her it was a deed of trust for $10,000 on the Cleveland Avenue property, and he had it folded so that she could not see the upper part. She said that Holdoway asked her to sign it and said that he was "going to take it to the bank and put it up as collateral for a loan." She said she had confidence in Holdoway because he had handled their business for more than ten years and had been their business adviser, and that for this reason she signed it without reading it. The acknowledgment was made by J. B. Corn as notary and Holdoway testified that Mr. and Mrs. Smith came to his office to acknowledge it. Both Mr. and Mrs. Smith denied this and had evidence to show that neither of them were in St. Louis on the date of the acknowledgment.

Mrs. Smith said that when she was served with papers in the Arkansas divorce case, in July, 1933, she conferred with Mr. Holdoway and that he tried to persuade her not to go to Little Rock. At that time, July, 1933, Holdoway showed her a written order from Smith to the resident manager of the apartment to pay the rents therefrom to Holdoway. However, plaintiff did go to Little Rock and employed lawyers to defend the suit and it was later dismissed. Smith also gave Holdoway an order on a firm in Chicago, to which the 1933 peach crop from the farm had been shipped, to pay the amount due on this shipment to Holdoway. Mrs. Smith said that she agreed that Holdoway could take $700 due on the peach shipment to pay taxes on the apartment building because he said it would save a penalty which would be added if taxes were not paid at that time. Mrs. Smith further testified that, in 1933, Holdoway tried to persuade her to make a property settlement and let Smith have a divorce, and said that he would give $150 out of his own pocket to see it settled. She said that Holdoway made the proposition that she take either the farm property or the Cleveland Avenue property for her part of the settlement. When she refused to do this he said: "Well, take half then; you take half interest in the farm and half interest here." (Cleveland Avenue apartment.) On November 26, 1934, Holdoway wrote separate letters to Mr. Smith and plaintiff, saying: "I have been compelled to sacrifice some of my securities to pay the back taxes on my property at 4603-09 Cleveland Avenue, of this City, and I am compelled to supervise this apartment personally, and wish to notify you that you are not to act as my agent or agent of the Holdoway Construction Company in any capacity. If you have any personal belongings in the basement of this property, I ask that you remove them during the month of December. I am sorry that I am compelled to do this, but I have no other alternative. I also wish you to notify Frank, Jr., that these apartments are not available for his use." This suit was begun in February, 1935.

Although it was Holdoway's contention that the quitclaim deed was in payment of Smith's indebtedness, it was shown that three

months later, December 6, 1930, he sent Smith a statement showing due from him amounts advanced for taxes and insurance on the Cleveland Avenue property during 1928, with interest charged at intervals during 1929 and 1930 up to the date of the statement. Credits were shown for $600.00 made in 3 equal payments during 1928 and 1929, leaving a balance due on December 6, 1930, of $439.50. A credit of $150 was shown on that date reducing the amount due to $289.50. Holdoway said that he could not tell "why it was written up as December 6, 1930." The explanation made by Holdoway and an accountant who testified in his behalf was that there was a mistake in Holdoway's books in which $25,000 was credited to Smith when this amount was traced as coming from the Holdoway Investment Company. It was claimed that this error was not discovered until after plaintiff commenced this suit.

Holdoway testified about this as follows:

"I issued two checks, I believe, in May of 1926, out of the Holdoway Investment Company's account for the total of $25,000.00. Those checks were made payable to me and were deposited in my account. That $25,000.00 should have been set up on the books to the credit of the Holdoway Investment Company and not a credit to Smith. . . . When I put it on my own account I credited (on May 25, 1926) Smith's account with $25,000:00 in place of crediting it to the Holdoway Investment Company. . . . The Holdoway Investment Company's books show that it was carried as a loan to Smith, P. F. Smith loan. The mortgage, however, was never executed. . . . Mr. Smith got the twenty-five thousand in—starting in July of 1925 up until May of 1926 Mr. Smith had been paid out by checks that $26,000.00 and Mr. Smith had received all of that money by May 1926 that was paid out of my personal account."

The accountant testified about this as follows:

"That amount is made up of two checks of the Holdoway Investment Company, 2781 and 2779; check 2781 (dated May 28, 1926) is payable to William J. Holdoway in the amount of $18,979.83, and 2779 (dated May 22, 1926) is made payable to the State National Bank in the amount of $6,020.17, or a total of $25,000.00. The check dated May 28, 1926, is included in the deposit of that date made by William J. Holdoway in the State National Bank, and the total amount of that deposit amounts to $19,210.10. In other words, all I have done there, your Honor, is to trace the receipt of this $25,000.00 to William J. Holdoway, and find that he got it from the Holdoway Investment Company, and in the shape of these two checks, and not from Smith. . . . Q. You are not saying' that through some source he didn't get the $25,000.00 from P. F. Smith? A. Yes, I am saying that; I am saying he didn't get the $25,000.00 from P. F. Smith; he got it from the Holdoway Investment Company. . . . By the Court: Holdoway may have gotten and did get twenty-five

thousand from the Holdoway Investment Company; now he may also have gotten twenty-five thousand dollars or more from Smith through some other transaction, whether the sale of real estate or what not? A. Grant that transaction may have occurred, your Honor, but—Q. You say you admit that could have occurred? A. Yes, sir. . . . Q. On the May 25th credit he could have turned over something else? A. Yes, sir. . . . I do think that this transaction of $25,000.00 is absolutely conclusive that William J. Holdoway did not get the money from P. F. Smith that records this entry in this book.''

The date of the credit to Smith, May 25,. 1926, did not correspond with the date on either of the two checks. The books, checks and records of Holdoway's company and of his own transaction were produced by him and were before the trial court during his testimony and that of his accountant. It was shown that Holdoway was indebted to the Tower Grove Bank in St. Louis to the amount of about $90,000 in 1933 and also accumulated losses of about $36,000 on the stock market. In December, 1933, he put up the $20,000 note secured by deed of trust on the Cleveland Avenue property with the Mississippi Valley Trust Company as collateral for a loan of $9000. Intervenor acquired it as collateral when it made Holdoway a loan to pay his indebtedness to the Mississippi Valley Trust Company.

The trial court's conclusion about this matter in a memorandum opinion filed was as follows:

''The most favorable view that can be taken of the evidence in this case would disclose that while defendant William J. Holdoway may have entered in good faith into a conspiracy (if there may be honor among conspirators?) with Peter F. Smith to assist Smith in stripping himself of his property and pauperizing himself to minimize any financial relief that the wife of Smith might obtain in the event of his contemplated divorce, yet one can only conclude that subsequent to entering into this conspiracy, when William J. Holdoway got into financial straits and difficulties and became heavily indebted to the bank and to his stock broker and, upon being pressed, sought to ease his own position by defrauding his co-conspirator Smith with knowledge perhaps that Smith would be in no position to seek or obtain any redress against him.''

In this memorandum opinion (which we will consider as advisory but not binding, in connection with the decree, to determine what findings were made upon the issues of fact, (see Klaber v. Booth (Mo.), 49 S. W. (2d) 181) the Chancellor discussed the question of the consideration for the quitclaim deed. After commenting on the statement of December 6, 1930, prepared after the execution of the quitclaim deed, which Holdoway claimed paid all prior indebtedness, he said:

''The evidence further disclosed that defendant William J. Holdoway at all times, where Smith was indebted to Holdoway Construc-

tion Company in much smaller sums than ($25,000.00) it claimed, always took a note secured by collateral from Smith, but in this instance where Holdoway claimed that the Company had made Smith a loan of $25,000.00 he asked for no security, nor took any security or evidence of the indebtedness. Holdoway's excuse for this that he had made a mistake in Smith's account of $25,000.00, which he had failed to charge to Smith's account, and that that error existed for a period of nine years on the Company's books and was not discovered until nine years later, at the trial of the case, in spite of all of their dealings during that time. Another error disclosed by defendant Holdoway Construction Company's books was the failure to credit defendant Peter F. Smith's account, with a second deed of trust for the sum of $11,500.00, which was part payment to Peter F. Smith on a sale of real estate known as 1648-54 Vandeventer Avenue and 4441-51 DeTonty Street, owned by Peter F. Smith and sold by Holdoway Construction Company for Smith's account, as disclosed by sales contract. In defendant William J. Holdoway's effort to prove up the consideration alleged by him to have been paid to Smith by Holdoway Construction Company for the conveyance of the property involved in the quitclaim deed dated September 4, 1930, he established an indebtedness due and owing from the Holdoway Construction Company to the defendant Peter F. Smith in the sum of $6,882.00 instead of showing any indebtedness from Smith to Holdoway Construction Company.''

Our conclusion is that there was substantial evidence to sustain the findings as to fraud and lack of consideration for the deed. These depend upon the weight and credibility of conflicting oral testimony by witnesses who appeared before the Chancellor. Our rule on review under such circumstances in equity cases is to defer to the findings of the Chancellor unless satisfied that they are against the weight of the evidence and clearly erroneous. [Fessler v. Fessler, 332 Mo. 655, 60 S. W. (2d) 17, and cases cited.] We approve and adopt his findings that plaintiff was induced by fraud to sign the deed, and that there was no consideration for the conveyance.

The next question is, what should a court of equity do to restore the rights lost by reason of the fraud? It is clear, of course, that the court should have canceled plaintiff's release of her inchoate right of dower which was the result of the quitclaim deed. [Kober v. Kober, 324 Mo. 379, 23 S. W. (2d) 149; 17 Am. Jur. 764, sec. 107; 19 C. J. 5261, sec. 192.] It is also clear that equity would not assist plaintiff's husband if he brought a suit against defendants in which only his own and Holdoway's rights were concerned. [Jones v. Jefferson, 334 Mo. 606, 66 S. W. (2d) 555; Keener v. Williams, 307 Mo. 682, 271 S. W. 489; Stillwell v. Bell, 248 Mo. 61, 154 S. W. 85.] However, even in a case solely between the parties, where a deed was made ''to avoid a possible outcome of some litigation,'' this court said

to bar the plaintiff from any relief, on the ground that he did not come into equity with clean hands, ''under the circumstances in evidence, would be to allow the maxim to work an injustice and wrong, and this will not be done.'' [Mentzer v. Mentzer, 325 Mo. 941, 30 S. W. (2d) 146.] In that case, a son procured an absolute deed from his father, who had previously reserved a life estate in the land, upon an agreement to care for his father the rest of his life, and then attempted to drive his father from the premises. The basis of the general rule and grounds for its relaxation in certain circumstances have been thus stated: ''The maxim being one founded on public policy, public policy may require its relaxation. Even when the parties have been found to be *in pari delicto,* relief has at times been awarded on the ground that in the particular case public policy has been found to be best conserved by that course.'' [21 C. J. 189, sec. 175; for Missouri cases in which the application of this maxim has been relaxed see Poston v. Balch, 69 Mo. 115; Bell v. Campbell, 123 Mo. 1, 25 S. W. 359; Snitzer v. Porkes, 324 Mo. 386, 23 S. W. (2d) 155; Cook v. Branine, 341 Mo. 273, 107 S. W. (2d) 28.] The reason for relaxation of the rule under exceptional circumstances is that ''the refusal by a court of equity of relief to those who come with unclean hands is not for the benefit of those whose hands are also unclean.'' [Moxie Nerve Food Co. v. Holland, 141 Fed. 202.] Nevertheless, ''although it will sometimes grant relief where the parties, though both in the wrong, are not equally so, . . . yet it only interferes in such a case to prevent a greater wrong.'' [McNear v. Williamson, 166 Mo. 358, 66 S. W. 160.]

In this case, we do have exceptional circumstances. This apartment building is worth at least $25,000, according to the minimum value shown by defendants' evidence. It apparently represents the major portion of the property, owned by plaintiff and her husband, which her efforts have aided in accumulating. Moreover, it is an income producing property and the evidence tends to show that this income was a very substantial part of the family support. To allow Holdoway to keep it, if he paid nothing for it, would not only allow him to profit by his own wrong but that would also, in all probability, cause plaintiff to lose the right of dower which the decree restores to her. This is true because the property is subject to a lien of $8500, which the court correctly held must be paid to the parties who advanced their money in good faith without any notice of the true situation. Holdoway has already profited by the extent of borrowing $8500 on it. Plaintiff, to save her dower right from loss by foreclosure, must pay this mortgage debt. Perhaps she can eventually collect this amount from Holdoway but that is uncertain. It is, of course, certain that she could not refinance this mortgage so as to prevent foreclosure if she only has an inchoate right of dower upon which to raise the money, with the rest of the title remaining in Hold-

oway. In this situation, to merely set aside the quitclaim deed as to plaintiff would be a useless gesture and amount to nothing. Holdoway's subsequent conduct in mortgaging property he did not own to borrow money for his sole use made him a greater wrongdoer than Smith instead of these parties being *in pari delicto* as defendants contend. Holdoway's acts subsequent to the deed (in which Smith did not participate) have created a situation where to deny restoration of the title as it originally was would make the strict application of the maxim work an injustice and wrong upon an innocent party, "and this will not be done."

Furthermore, defendants' answer affirmatively advanced the alternative theory that the quitclaim deed was not intended as an absolute conveyance but only as security for the indebtedness shown by the account of Smith with Holdoway and recognized that, on this view, neither Holdoway nor his company would be the owner of the property but only the holder of a lien thereon. On this theory Smith would be in the position of a debtor who had paid the debt for which he gave security and would be entitled to its return. Since this theory was advanced by defendants, they are in no position to insist on any right to retain title, because, when the court found all indebtedness to be wiped out, upon proper credits being made, leaving a balance due from them, then the basis of their alleged lien was completely gone. However, the court had no authority either under the pleadings or under general equity jurisdiction to do anything affecting the title except to cancel the quitclaim deed. It could not create an estate, by decree, that had never existed, and which no one had ever intended to create. Plaintiff did not even ask for such relief, but, if she had, a conveyance to create an estate in entirety could only be made by the parties. This part of the decree is *coram non judice* and void. [Friedel v. Bailey, 329 Mo. 22, 44 S. W. (2d) 9, and cases cited.]

Concerning defendants' assignment that the $6882 judgment was outside the pleadings, it is only necessary to say that it was defendants who asked for an accounting to ascertain and determine the amount of Smith's alleged indebtedness to them. They cannot complain when it resulted in a balance due the other way, especially in view of the allegations of Smith's answer and cross-bill alleging an indebtedness due to him and the fact that all this evidence on the accounting was put in without objection. [See Robinson v. Field, 342 Mo. 778, 117 S. W. (2d) 308.] Defendants' contention that the evidence does not support a finding of an indebtedness of this amount cannot be considered here because the books, checks and other documents which were before the trial court and upon which his find was based are not in this record. Not even defendants' accountant's report of his examination is before us. Furthermore, it does appear that the court found that the payment of a trust deed of $11,500 was not credited to Smith's account; and that defendants' accountant

admitted that his figures on this transaction did not show this credit which the sales contract in evidence did show to be due Smith. If other items (except the alleged $25,000 mistake) shown by defendants' books as due from Smith to Holdoway are credited against this $11,500, a balance of about $7000 would remain due to Smith. The amount found by the court to be due must therefore be affirmed. Likewise, if Smith owed nothing to Holdoway and he and plaintiff must pay the $8500 lien Holdoway put on their property, for money Holdoway got and used, it was proper for the court to enter judgment against Holdoway for that additional amount.

This brings us to the issues on the intervention. The first decree entered herein canceled the deed of trust as well as the quitclaim deed, although the holder was not a party. When this decree was entered, the holder asked leave to intervene and was permitted to do so. There was a hearing on the merits of the intervention and the final decree hereinabove referred to was entered. The court found that the note and deed of trust was transferred by the Mississippi Valley Trust Company ("an innocent holder for value in due course") to intervenor "for value in due course without knowledge of any equities as a pledge or collateral security for a loan" to Holdoway. These findings will be adopted here as the facts of the transaction since there is really no evidence to the contrary. Plaintiff claims that there was an interest note due and unpaid at the time intervenor got the note and mortgage from the Mississippi Valley Trust Company. However, intervenor's evidence showed that this note had been detached and taken by Holdoway and was not received by it. Moreover, since plaintiff had not appealed, she cannot attack these findings here. [Thorp v. Daniel, 339 Mo. 763, 99 S. W. (2d) 42.]

The part of the decree objected to by intervenor is the outright cancellation of both the quitclaim deed and the trust deed, providing only that the property is "subject, however, to a first and prior lien in favor of intervenor, Mutual Bank and Trust Company, as pledgee, for and in the sum of $8,500.00, together with interest as aforesaid, as collateral security for the indebtedness of defendant William J. Holdoway, to said intervenor, Mutual Bank and Trust Company, and unless said indebtedness be discharged within ninety days from date of final judgment after appeal, if any, intervenor may apply to this Court for leave to foreclose and sell said real estate to satisfy its said lien." Intervenor says that this substitutes "an inadequate new alleged lien to intervenor and constituting intervenor merely as 'pledgee of a lien' thereby depriving intervenor of the collateral pledged to it by the defendant Holdoway as security for his loan due intervenor;" and also prohibits "intervenor from taking any action until ninety days after a final decree on appeal, and then only to making a new application to the trial court for leave to foreclose."

Intervenor's rights as a holder in due course are fixed by Sections

2655, 2656 and 2685, Revised Statutes 1929 (Mo. Stat. Ann., secs. 2655, 2656 and 2685, pp. 658 and 678). "The deed of trust securing a negotiable note passes with it and partakes of the same characteristics of negotiability and freedom from secret equities and liens in favor of the good faith purchaser for value and without notice as does the note itself" and this "applies also to persons taking the same as collateral security." [George v. Surkamp, 336 Mo. 1, 76 S. W. (2d) 368; see, also, Batson v. Peters (Mo.), 89 S. W. (2d) 46, and cases cited l. c. 52.] "The relief of cancellation will not be granted against a bona fide purchaser for value and without notice of the fraud or other ground for cancellation." [Morris v. Hanssen, 336 Mo. 169, 78 S. W. (2d) 87; Ludwig v. Scott (Mo.), 65 S. W. (2d) 1034; Crawford v. Aultman & Co., 139 Mo. 262, 40 S. W. 952; Mayes v. Robinson, 93 Mo. 114, 5 S. W. 611; Hurley v. Taylor, 78 Mo. 238.] ▆ Plaintiff contends that the deed was void as a release of dower because she never acknowledged it. However, plaintiff said that she intended to execute a deed of trust for $10,000. Certainly she authorized and consented to such a transaction, and made it possible for Holdoway to consummate it. Under all the circumstances, we hold that she is estopped to assert the invalidity of the deed against intervenor whose claim is less than the amount of the lien she agreed should be placed upon the property. The holder of collateral has "the right to hold all of its collateral until all the loans for which that collateral was held were paid in full." [Russell v. Empire Storage & Ice Co., 332 Mo. 707, 59 S. W. (2d) 1061.] It is obvious that, if intervenor is the holder in due course of the note and deed of trust, it is, under the negotiable instruments statutes above mentioned, entitled to enforce the same according to their terms to obtain full payment of its claim. Therefore, the court erroneously restricted it.

▆ There is, however, no necessity for the retrial of any issue in this case. "Where the trial court's finding and decree in an equity case is not sustained by the law and the evidence, this court will proceed to make its own finding and enter such judgment as equity and justice require." [Friedel v. Bailey, supra.] We have stated what findings of the trial court we have adopted and what parts of the decree are not supported by them. A decree should be entered containing the following provisions:

First: That the quitclaim deed should be canceled as between the parties and be void as to anyone claiming thereunder except through intervenor but that the rights of intervenor should not be affected by such cancellation.

Second: That the trust deed should remain a valid lien for the amount due intervenor, including interest, with unrestricted rights in intervenor to proceed by foreclosure in accordance with its terms.

Third: That the indebtedness secured by the trust deed above the amount due intervenor, including interest, should be canceled.

The orders for a permanent injunction against defendants, except the trustee and intervenor, and the money judgments in the decree are affirmed, and it is reversed as to other orders and the cause remanded with directions to enter a decree in compliance with the requirements herein stated. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.