Frances G. DRECKSHAGE, Hazel White and John William White, Respondents,

v.

COMMUNITY FEDERAL SAVINGS AND LOAN ASSOCIATION, a Corporation, and John T. Miller, Substitute Trustee, Appellants.

No. 59697.

Supreme Court of Missouri, En Banc.

Sept. 12, 1977.

Carroll J. Donohue, St. Louis, for appellants.

Dale L. Rollings, St. Charles, for respondents.

FINCH, Judge.

This is an action wherein plaintiffs sought cancellation of instruments by which they had subordinated their purchase money deeds of trust to a later deed of trust given by Bill and Rosemary Bangert to Community Federal Savings and Loan Association (hereinafter Community). Cancellation was sought on the basis of alleged fraud and deceit by Bill Bangert in obtaining plaintiffs' signatures on the subordination agreements. Plaintiffs also requested equitable foreclosure of their deeds of trust and sought punitive damages against defendant Bill Bangert.

The trial court found for plaintiffs and granted broad relief, including cancellation of the subordination agreements and equitable foreclosure of plaintiffs' first deeds of trust. It also awarded punitive damages on a separate count against Bill Bangert. Only Community and Miller appealed. On appeal, the Missouri Court of Appeals, St. Louis District, reversed on the basis that plaintiffs' action was barred by the statute of limitations. On application, we ordered the case transferred and we now decide it as though here on direct appeal. We reverse and remand with directions.

Bill Bangert was the principal proponent of the creation of a large sports, shopping and industrial complex in northwest St. Louis County. As part of that effort, he obtained the incorporation of the village of Champ and made efforts to annex considerable land to that village. For details of the plan, see *State ex rel. Eagleton v. Champ*, 393 S.W.2d 516 (Mo. banc 1965). Included in the proposed annexations were tracts of land owned by plaintiffs.

In 1960 Bangert contracted to purchase 171 acres of farm land from Frances Dreckshage for $85,000, paying $1,000 down and giving notes and a purchase money deed of trust payable over 5 years for the balance. At approximately the same time, he contracted to buy 110 acres from the Whites for $90,000. $1,000 was paid down and the

rest was covered by notes and a purchase money mortgage payable over a 5 year period. Bangert made one interest payment on the Dreckshage notes in January 1962, but made no other payments. The only payments made on the White notes were the interest due in December 1961, plus payments on interest of $1,000 in 1963 and $2,500 in 1965.

In attempting to implement his development plan, Bangert undertook to build a plant to be leased to the R. C. Can Company. In the spring of 1962, he applied to Community for a loan of $2,100,000 (later increased to $2,700,000) to finance construction of that building. The proposed loan was approved on condition that it be secured by a first deed of trust, insured by a mortgage policy of title insurance, on a tract which included not only the actual building site but also the other land adjacent thereto which Bangerts owned, including the Dreckshage and White tracts.

Bangerts and Community contracted with Land Title Insurance Company of St. Louis to act as the escrow and disbursing agent in the loan transaction. The contract provided for Land Title to issue at Bangert's expense a mortgage policy of title insurance to cover the loan. Land Title issued an interim binder in which the Dreckshage and White deeds of trust were listed as exceptions to the execution by Bangerts of a first deed of trust to Community. In order to eliminate those exceptions and meet the requirements for the loan, it was necessary that said deeds of trust be satisfied or that agreements which subordinated the Dreckshage and White purchase money mortgages to a deed of trust to Community be executed and recorded. In addition, the binder required that agreements subordinating the two deeds of trust to certain roadway easements be furnished and that a 2.511 acre tract be released from the Dreckshage deed of trust and added to the actual R. C. Can tract.

After issuance of the binder, Land Title's attorney met with Bangert's attorney to explain the exceptions listed therein and what would be required as a condition to issuance of the mortgage policy of title insurance. Bangert's attorney then prepared agreements whereby the Dreckshage and White purchase money deeds of trust would be subordinated to the deed of trust to be given by Bangerts to Community to secure the loan for the construction of the R. C. Can building. After approval thereof as to form and substance by Land Title's attorney, Bangert's attorney delivered them to Bangert who secured execution thereof by the Whites on August 13, 1962 and by Mrs. Dreckshage on August 16, 1962. The required agreements subordinating the deeds of trust to certain roadway easements were executed at the same time. Neither Mrs. Dreckshage nor the Whites read any of the agreements before executing them.

The executed subordination agreements were delivered by Bangert to Land Title which recorded them on October 10, 1962.[1] These subordination agreements were relied on by Community when it made the loan to Bangerts and disbursed the money thereon to Land Title as escrow agent. Subsequently, the building for which the loan was obtained was built and occupied by R. C. Can.

Bangert experienced financial difficulties and became delinquent on the loan from Community. He executed an assignment of the rentals from R. C. Can, but these were not sufficient to take care of all sums due on the deed of trust and his delinquency on the loan continued. In July 1971 Community began foreclosure proceedings, with the sale set for August 11, 1971. In September 1971 Bangert was adjudged a bankrupt.

Plaintiffs were notified by letter of the foreclosure proceedings by Community. They promptly made inquiry as to the proceedings and the basis therefor, after which

1. On that date Land Title recorded 21 documents in connection with the Community loan to Bangerts. These included the various subordination agreements from Mrs. Dreckshage and the Whites and subordination agreements from

other persons in the area. They also included an instrument from Mrs. Dreckshage dated September 27, 1962, which released from her deed of trust the 2.511 acres which were to be added to the R. C. Can tract.

they filed this action, claiming that this was the first time that they had known that the agreements executed in 1962 subordinated their first deeds of trust. They alleged that these agreements had been secured by fraud and should be cancelled.

At trial Mrs. Dreckshage testified that Bangert had represented the documents presented to her for signature as being agreements concerning the 2.511 acre tract she was to release and that in signing the documents she had relied upon a note of approval from her attorney, presented by Bangert, which had been obtained on the basis of her attorney's examination of an agreement concerning the 2.511 acre tract, not the agreement subordinating her deed of trust to that of Community. Mr. and Mrs. White testified that Bangert had represented to them that the paper presented for execution was just another document related to the proposed annexation to the village of Champ, similar to many they had signed before, and that a subordination agreement had not been mentioned. Both Mrs. Dreckshage and the Whites testified that they did not read the instruments before signing them.

The first issue for resolution is defendants' contention that plaintiffs' cause of action is barred by limitation. This necessarily involves a determination as to which statute of limitation is applicable.

■ The objective of this suit is to cancel for fraud the instruments which subordinated plaintiffs' purchase money mortgages. It does not attack the conveyances whereby the tracts were conveyed by plaintiffs to Bangert nor does it seek to set aside those conveyances or recover the real estate on the basis of fraud. For these reasons we agree with the trial court's conclusion that § 516.120(5),[2] which establishes a five-year statute of limitation, is applicable. *Ludwig v. Scott,* 65 S.W.2d 1034, 1035 (Mo.1933).

Sec. 516.120(5), after establishing a five-year statute of limitation, provides that an action seeking relief on the ground of fraud accrues when the aggrieved party discovers the facts constituting the fraud.[3] The actions of Bill Bangert which induced plaintiffs to sign the subordination agreements and which the trial court found to be fraudulent occurred in the summer of 1962 and this suit was not instituted until 1971, considerably more than five years later. However, the evidence disclosed and the trial court found that plaintiffs did not read the subordination instruments when presented to them for signature and did not learn until 1971 of the true nature of the instruments they had signed and of the fraud perpetrated upon them. Hence, the statute began to run at that time unless, as defendants contend, plaintiffs were charged with constructive notice of the fraud by the fact that the subordination instruments in question were recorded on October 10, 1962. To sustain their position that plaintiffs were charged with constructive notice of the true nature of the instruments they had signed and, hence, of the fraudulent misrepresentations made to them, defendants rely on § 442.390 which provides:

"Every such instrument in writing, certified and recorded in the manner herein prescribed, shall, from time of filing the same with the recorder for record, impart notice to all persons of the contents thereof and all subsequent purchasers and mortgagees shall be deemed, in law and equity, to purchase with notice."

Defendants' position on this issue is clearly stated in their brief in this language:

"It is the law that the very liberal provisions of § 516.120(5) apply only to 'concealed' fraud. The alleged fraud in this case was not of a secret nature. Here the Subordination Agreements, complete and perfect on their faces, and in form appropriate for recordation were of rec-

---

**2.** All statutory references are to RSMo 1969 unless stated otherwise.

**3.** The text of § 516.120(5) is as follows:

"(5) An action for relief on the ground of fraud, the cause of action in such case to be

deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud."

ord when the Community Federal Deed of Trust was recorded and have been of record ever since. That was open to discovery by the plaintiffs at all times because the recording of the Subordinate Agreements constituted notice to the whole world of their contents. Had there been fraud on Bangert's part, it was easily subject to discovery after October 10, 1962 because it was boldly spread on the County records. The statute began to run from the date of recordation, the time at which any fraud became discoverable. * * * "

Defendants cite various cases in support of their contention that plaintiffs' cause of action is barred by limitation but the only case cited which seems to support the proposition that plaintiffs herein were obligated to search the records and, hence, barred by limitation from maintaining this action for fraud, is *Ludwig v. Scott, supra,* wherein the court said at 1035 that because the transactions were a matter of public record, plaintiff therein "could have learned at any time upon inquiry there just what she had signed and how great her liability was." In *Ludwig* the court concluded that the running of the statute of limitations was triggered by the recordation in 1923 of the instruments that had been procured in 1922 by false representations, even though it was 1927 when plaintiff actually gained the knowledge necessary to cause her to make inquiry into her liabilities resulting from the false representations of her former employers.

The rationale of defendants' position is that § 442.390 makes recordation of an instrument notice to everyone, including owners and other persons with prior existing interests, and that even owners of existing rights act at their peril if they do not check in the recorder's office sufficiently often to avoid being affected by subsequently recorded instruments. It is our conclusion that this question has not been definitely resolved in Missouri by *Ludwig* or the other cases cited and that we should determine in this case whether § 442.390 has such a meaning and effect.

A concise statement of the basic purpose of recording statutes is contained 6 Powell on Real Property ¶ 913 (1977):

" * * * [R]ecordation enactments began in an effort to protect present ownerships by the establishment of public records. Early in their history, however, they took on the added function of establishing a system of statutory priorities for the protection of subsequent purchasers of land. This added function has become the general and basic purpose of these statutes in all present day enactments. No variation on this point is now discoverable."

Further discussion of the purpose and effect of recording statutes is contained in Annot., 137 A.L.R. 268, which deals with "Public records as notice of facts starting running of statute of limitations against action based on fraud." It is stated at 276 thereof:

" 'The proposition is frequently announced that, under the registration laws, the proper record of an instrument authorized to be recorded is notice to all the world. But this means simply that the record is open to all, and is notice to interested parties. The record of an instrument is notice only to those who are bound to search for it. It is not a publication to the world at large. The recording of a deed or mortgage, therefore, is constructive notice only to those who have subsequently acquired some interest or right in the property under the grantor or mortgagor.' 23 RCL p. 211, § 71.

"It is apparent, therefore, that where a court decides that a defrauded party is charged with notice of facts appearing from the records, so as to start the running of the statute of limitations against his action, the ruling cannot well be based on the recording laws, because those laws have reference to the outstanding rights and interests of third persons and are intended to give protection to those who in good faith acquire interests in reliance upon the records and who meet the conditions laid down. The recording laws establish a priority as between innocent

claimants to the same property or right; they are not intended to give security to the perpetrators of fraud as against their victims. As pungently stated in *Andrews v. Smithwick* (1870) 34 Tex. 544, * *, the recording laws do not make 'provision for the registration of fraud.'

" * * * [T]he purpose of recording laws is to notify persons acquiring title or rights subsequent to those of record, and not to give protection to the perpetrators of fraud. * * * * "

Particularly pertinent to the question of whether plaintiffs are persons who would have an obligation to search the records for subsequently recorded instruments which might affect their existing purchase money mortgages and whether recording constitutes notice to them, the same annotation states at 283:

"According to the prevailing and, it seems, the better-reasoned doctrine, one who executes an instrument in reliance upon false representations as to its character or contents is not by the mere record of the instrument given such notice of the fraud as will start the running of the statute against his cause of action.

"The doctrine stated has been applied in cases where the fraud related mainly to the character of the instrument executed."

A recent case in Alabama, which has a statute similar to § 442.390, applies the foregoing rule. In *Cumberland Capital Corp. v. Robinette*, 57 Ala.App. 697, 331 So.2d 709 (1976), a mother brought an action against her son and daughter-in-law to set aside a deed and against a bank to set aside a mortgage obtained from the son and daughter-in-law after they had fraudulently acquired the mother's property by forging her signature to the deed. The defendant bank argued that plaintiff mother was barred by the one-year statute of limitations pertaining to actions for fraud. The

statute provided that the suit must be brought within one year from the time the fraud was discovered or should have been discovered and the bank contended that plaintiff received notice of the deeds when they were recorded by her son. The court disagreed with the bank on this point, citing an earlier decision of the Alabama Supreme Court [4] for the proposition that "the notice contemplated by the recording statutes affects subsequent parties and not those antecedent in the chain of title." 331 So.2d at 714.

Language in *Young v. Howard*, 73 App. D.C. 340, 120 F.2d 712, 713 (1941), states what we believe to be the purpose and meaning of statutes such as § 442.390:

"A primary purpose of the recordation of an instrument is to give notice of its existence to those about to deal with the property involved. Such persons are protected by, and charged with, notice of the recorded instrument. The purpose, in most instances, is not to inform those with existing interests of events purportedly affecting their property and to charge them with such knowledge. It is often said that a recordation operates prospectively, not retrospectively. To attribute the latter effect to a recordation would necessitate periodic checks by owners, lienholders, and other with existing interests. A person should be circumspect when he enters into a transaction and in performing his subsequent contractual duties, but to require him to act as a member of a watch and ward society to safeguard his position against all the world is neither reasonable nor in accord with the authorities. He who has established his position is entitled to rest as against those with whom he has no continuing obligation." [5]

▇ We conclude and hold that plaintiffs' action accrued when they learned in

---

4. *Pittman v. Pittman*, 247 Ala. 458, 25 So.2d 26 (1945).

5. Other cases in accord include *Blumenthal v. Serota*, 129 Me. 187, 151 A. 138, 140–41 (1938); *Faulkenburg v. Windorf*, 194 Minn. 154, 259

N.W. 802, 805 (1935); *Allen v. Webb*, 87 Nev. 261, 485 P.2d 677, 682 (1971); *Kinch v. Fluke*, 311 Pa. 405, 166 A. 905, 906 (1933); *Leonard v. Benfford Lumber Co.*, 110 Tex. 83, 216 S.W. 382 (1919).

1971 of the alleged fraud perpetrated on them, not in 1962 when the subordination agreements were recorded, and that plaintiffs' action is not barred by limitation. To whatever extent *Ludwig v. Scott, supra,* is inconsistent with this decision, it no longer should be followed.

■ Defendants' second proposition is that plaintiffs' evidence did not establish fraud in the procurement of the execution of the subordination instruments and that plaintiffs' suit must fail for that reason. The trial court made findings of fact wherein it found from the evidence that fraud was committed by Bill Bangert in procuring execution of these instruments. Applying the test specified in Rule 73.01, V.A.M.R., as interpreted in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976), we cannot reverse the judgment of the trial court on the basis that this finding of fact was not supported by substantial evidence or was against the weight of the evidence. We overrule this contention.

The third and critical issue to be determined is who shall suffer the effects of the conduct of Bill Bangert which induced the execution of the subordination agreements in question.

The trial court, after considering conflicting assertions that plaintiffs and Community had been negligent in not discovering Bangert's fraud, stated in its conclusions of law that it would "find neither the Plaintiffs nor Community Federal negligent although it may be arguable that additional precautions by either or both could have averted the fraud or at least caught it." The court went on to hold for plaintiffs, so concluding on the basis that "whether all or neither were negligent * * * the equities are equal and the first Deed of Trust in time must prevail," citing *Lustenberger v. Hutchinson,* 343 Mo. 51, 119 S.W.2d 921 (1938).

We likewise conclude that we are dealing with a situation wherein we have two innocent and injured parties (Mrs. Dreckshage and the Whites on the one hand and Community on the other). Neither was guilty of or responsible for the fraudulent conduct which resulted in the problem confronting us. Neither was chargeable with knowledge of the fraud. However, the rule stated in *Lustenberger* is specifically premised upon the assumption that the equities must be equal. The court there found that the trial court was justified in concluding that the equities between the parties were not unequal where both parties were found to have been negligent in failing to make further investigation. 119 S.W.2d at 927. The case cannot be said to establish the proposition that innocence or negligence on the part of both parties precludes further inquiry into the relative equities of the parties and establishes conclusively that they are equal. Rather, the equities between the parties is a separate matter to be determined by the court under all the circumstances after both parties are found to be either innocent of wrongdoing or negligent. As subsequently discussed, we do not conclude that the equities in this case are equal even though neither party can be said to have been responsible for the fraudulent conduct.

Plaintiffs argue that Community should have been alerted to investigate the subordination agreements by the recitation of only $1.00 consideration for agreements subordinating very substantial first deeds of trust, by the alleged fact that it was not in the interest of Mrs. Dreckshage and the Whites to subordinate their deeds of trust and by the fact that Mrs. Dreckshage and the Whites were in possession of these tracts owned by Bangert. However, we reject this contention.

■ In the first place, the subordination agreements recited more consideration than $1.00. They recited also the fact that construction of the R. C. Can building and development of the area as an industrial project would result and that this would enhance the value of all the property in the area. This was important to plaintiffs because they had sizeable deeds of trust, representing almost the total price for which they had sold their lands, and industrialization would increase the value of the security for their deeds of trust. In addition, the

subordination agreements recited that construction of the R. C. Can building would require Bangerts to establish other facilities, including a railroad spur track line, roads, road interchanges, increased levees, sewer disposal means and restrictions, and lines and conduits for electricity, water and gas utilities, all of which would provide service to the tracts covered by the deeds of trust being subordinated and increase their value as security for the deeds of trust. These recitals were sufficient to make the subordination agreements facially valid insofar as adequate consideration was concerned. They were not such as to require Community to investigate the consideration for the subordination agreements or the circumstances of their execution before relying thereon.

Nor can it be held that Community was put on notice to investigate the subordination agreements and their execution on the basis that it knew or should have known that plaintiffs had no motive or reason to subordinate their deeds of trust. It is true that Bangert's obligations to plaintiffs under their respective deeds of trust were fixed and certain and that plaintiffs would not receive more money than said sums as a result of subordinating. However, as previously pointed out, consummation of the plan of industrialization would increase the value of land in the area and improve plaintiffs' security for their deeds of trust. That did provide a motive for plaintiffs to subordinate. The question is not whether that was the most prudent course of action. It was at least an arguably sound course to follow. That being true, Community was not put on notice that it should have further investigated the execution of the subordination agreements before relying thereon in making the loan for construction of the R. C. Can building.

We also reject the contention that possession of the tracts by plaintiffs placed an obligation on Community to investigate the subordination agreements. This was not an instance of unexplained possession which might indicate an undisclosed interest in the property. The sales agreements whereby these properties had been sold by Mrs. Dreckshage and the Whites to the Bangerts expressly provided that sellers should retain possession of the crop land until payment in full of the purchase price secured by the purchase money deed of trust, with sellers to pay the taxes during such time. These agreements were recorded and Community had knowledge thereof. Such possession did not require Community to investigate the execution of the subrogation agreements in question.

This is one of those regrettable situations where one of two innocent parties must suffer. In determining which one, we must consider the fact that while the Whites and Mrs. Dreckshage were misled by Bangert as to the nature of the instruments presented for execution, they did not read them before execution and they signed and acknowledged subordination agreements which they did not know they were signing. As a result, those documents were recorded and, in reliance thereon, Community made a $2,700,000 loan to Bangert, taking a first deed of trust on the property. Although Community was not, technically speaking, a bona fide purchaser for value because it "purchased" nothing, in effect it was an innocent purchaser for value as the result of its loan on the property. A mortgagee of real property is regarded for some purposes as a purchaser and is entitled to the same protection given a bona fide purchaser if it meets certain tests. 55 Am.Jur.2d Mortgages § 324 (1971); 59 C.J.S. Mortgages § 232 (1949). To be accorded such status, the mortgage must be supported by a valuable consideration, it must have been taken in good faith and without fraud, and the mortgagee must have had neither actual nor constructive notice of outstanding rights of others in the property. *Spikes v. Clark*, 411 S.W.2d 148 (Mo.1967). *See also Johnson v. Stull*, 303 S.W.2d 110, 118 (Mo.1957). Community meets those requirements in this situation.

Plaintiffs argue that Community was not a bona fide purchaser for value for the reason that Community was a party to the subordination agreements. The fact is

that Community was not a party thereto. The documents make reference to the fact that the Dreckshage and White deeds of trust are being subordinated to a deed of trust to be given by Bangerts to Community to provide funds for construction of the R. C. Can building but that did not cause Community to be a party to that agreement. Such recitations did not prevent Community from being a bona fide purchaser for value.

▪ In addition, plaintiffs argue that Community was instigator of the fraudulent subordination agreements and, hence, cannot be a bona fide purchaser who acted in reliance thereon. We also reject this argument. Community, when Bangerts applied for a loan to finance construction of a building to lease to R. C. Can, advised that it would make the loan only if it received a first deed of trust on all of Bangert's land in that area. That included land on which Whites and Mrs. Dreckshage had deeds of trust and meant that Bangert would have to pay off the deeds of trust or arrange to have them subordinated. Such requirement did not mean that Community was the instigator of fraud or that it had any reason to suspect that fraud would be committed in meeting the requirements of a first deed of trust to secure its loan. It did not follow that fraud should be suspected or sought out because subordination was involved.

▪ Finally, plaintiffs argue that Community must be held to have had the same knowledge that Land Title had and for that reason was chargeable with knowledge of the fraud practiced by Bangert. The simple answer to this contention is that there was no showing that Land Title had any knowledge of such fraudulent activities or that there was anything wrong with the subordination agreements. They were regular on their face and clearly recited that

the White and Dreckshage deeds of trust were subordinated to a deed of trust to be given to Community.[6]

If this were litigation involving only the Whites, Mrs. Dreckshage and the Bangerts, there is no question that the Whites and Mrs. Dreckshage would be entitled to relief. However, we must resolve the comparative rights of Community, which innocently relied on the instruments Mrs. Dreckshage and the Whites signed, and the rights of Mrs. Dreckshage and the Whites. The situation is somewhat similar to that considered by this court in *Spikes v. Clark*, 411 S.W.2d 148 (Mo.1967). In that case, Esther Spikes owned a four-family flat on which there were two deeds of trust. She lived in one apartment and rented the others. The building was in need of repairs and Mrs. Spikes was anxious to sell it, but was unable to find a buyer at $13,500, the price she wanted. Before going on a vacation trip, Mrs. Spikes signed a sale agreement with a Clark Realty Company to sell for $13,500, with $100 down and the other payments and conditions specified in the contract.

When Mrs. Spikes was leaving on her vacation, Clark took her to the train and told her that there was some difficulty about clearing up an old mortgage. He presented some papers to sign which Mrs. Spikes says were represented as insurance papers in connection with clearing up the title. She signed them with that understanding.

After her return, there were meetings between Clark and Mrs. Spikes, during one of which he showed her an executed, recorded warranty deed to the property which he said she had signed. It was dated July 8, 1964, the day Mrs. Spikes left on vacation. She told Clark she had not signed a warranty deed but he insisted that she had. Meanwhile, the grantee in the deed, an

6. The White subordination agreement, after reciting the considerations, stated as follows:
"Parties of the First Part agree to and do hereby subordinate the lien of their aforesaid Deed of Trust, recorded in Book 4462 Page 38 of the St. Louis County Records, to a Deed of Trust to be executed by the Parties of the Second Part to Community Federal Savings and Loan Association for the necessary financing for the construction of the said R. C. Can Company building and the aforesaid industrial development facilities."
The Dreckshage deed of trust contained identical language except for a difference in book and page numbers.

employee of Clark, had borrowed $10,000 from Cass Federal Savings & Loan, securing it by a deed of trust on the property. Out of the proceeds the two prior deeds of trust had been paid off, the balance of the loan going to Clark Realty Company.

Mrs. Spikes brought suit to set aside the deed she had signed, a subsequent deed by the grantee therein to relatives of Clark, and the deed of trust placed on the property. The trial court granted the relief she sought, including a personal judgment against Clark and the others involved, but declined to set aside the deed of trust of Cass Federal. That judgment was affirmed on appeal. In disposing of the issue of the rights as between Mrs. Spikes and Cass Federal, the court said, 411 S.W.2d at 154–55:

"  *  *  *  The deed having thus been validly executed and delivered, even though by the agency of a species of fraud practised by Clark and his straw-party relatives and employees, was not void and as between the two equally innocent parties, Mrs. Spikes on the one hand and Cass Federal on the other hand, the loss must necessarily fall upon the grantor whose conduct and misplaced confidence initially brought about the circumstances permitting the subsequent misconduct and resulting loss.  *  *  * "

The rule announced above is consistent with what this court said in *Hart v. Parrish,* 244 S.W.2d 105, 109 (Mo.1951):

"Although a conveyance may be voidable for fraud in the hands of a grantee, if he has given a mortgage on the property to one who advances money in good faith and without notice of the fraud, the claim of fraud may not be set up against the mortgagee. The relief of cancellation will not be granted against a bona fide purchaser for value and without notice of the fraud or other ground of cancellation. The rule is otherwise, if knowledge of the fraud can be brought home to the mortgagee. *Murphy v. Butler County,* 352 Mo. 1082, 180 S.W.2d 732; *Smith v. Holdoway Const. Co.,* supra [344 Mo. 862, 129 S.W.2d 894]; *Morris v. Hanssen,* 336 Mo.

169, 78 S.W.2d 87; *Hunter v. Hunter,* 327 Mo. 817, 39 S.W.2d 359; 59 C.J.S., Mortgages, § 234, p. 304."

Likewise, it is consistent with the general principle, stated in 59 C.J.S. Mortgages § 282c(3):

"Where the owner of a mortgage has been induced by fraud to execute a release thereof, it will generally be reinstated to its original priority of lien as to others chargeable with notice, or as against a mere volunteer or the holder of an intermediate lien who will not be prejudiced thereby; but such restoration of lien cannot be obtained to the detriment of an innocent purchaser or encumbrancer, who has, for a valuable consideration and without notice, acquired his interest in reliance on the recorded satisfaction.  *  *  * "

■ We conclude and hold that the rule announced in *Spikes* is applicable rather than the rule in *Lustenberger.* Accordingly, we hold that the trial court erred in setting aside the subordination agreements, erred in holding that plaintiffs' purchase money mortgages were liens which took precedence over the deed of trust held by Community and erred in equitably foreclosing the Dreckshage and White deeds of trust and extinguishing the lien of Community's deed of trust on the tracts in question.

The judgment is reversed and the cause remanded with directions to enter judgment in accordance with the views herein expressed.

BARDGETT, HENLEY, DONNELLY, SEILER, JJ., and TURNAGE and DIXON, Special Justices, concur.

MORGAN, C. J., and RENDLEN, J., not sitting.