Homer V. PRICE, Respondent,

v.

Carl R. RIDLER, Jr., and Violet A. Ridler, his wife, Gertrude Siebel, Irvin W. Lorts and Helen J. Lorts, his wife, Warren C. Kappler and Gloria C. Kappler, his wife, Appellants.

No. 50110.

Supreme Court of Missouri,

Division No. 1.

Dec. 9, 1963.

Blackwell & Blackwell, Earl R. Blackwell, Hillsboro, for defendants-appellants.

Samuel Richeson, Dearing, Richeson & Weier, Hillsboro, for plaintiff-respondent

HOUSER, Commissioner.

■ Action in equity by the purchaser for specific performance of a contract for the sale of real estate. The trial court decreed specific performance and the defendants (sellers and subsequent purchasers from the sellers) have appealed. Title to real estate is involved within the meaning of Art. V, § 3, Constitution of Missouri, V.A.M.S. Cossairt v. Reich, Mo.Sup., 370 S.W.2d 291.

Carl R. Ridler, Jr. acquired a 257-acre farm in Jefferson County in 1953. He testified he paid $16,500 for the farm, but admitted that the documentary stamps indicate a consideration of $15,000. On January 6, 1961 he and Mrs. Ridler gave Haag Real Estate Company of St. Louis an exclusive listing contract at a price of $40,000 "or offer," agreeing in consideration of the agent's advertising and efforts to sell to pay a 10% commission on the price named "or such other price" as the sellers might accept, if a sale of the property be made "while in charge of" the agent. The Ridlers reserved the right to terminate the agency one year after January 6, 1961 on one month's notice in writing.

On July 8, 1961 Mr. Ridler wrote a letter to plaintiff, Homer V. Price, a real estate developer, stating that the farm was for sale and that he thought Mr. Price would be interested in buying it since it was between Price's farm and the main road. Mr. Price replied that he was not acquainted with the farm or its location, asked for clarification and expressed a desire to know the asking price. On July 16, 1961 Mr. Ridler wrote Mr. Price giving him the location and stating that it was "valued at $12,000" but he would "consider an offer below that amount, please feel free to do so."

Before this exchange of correspondence Mr. Price did not know the Ridlers and had never made any effort to buy the farm. Upon receipt of the second letter Mr. Price went to Mr. Ridler's home where they had a preliminary discussion without reaching any agreement, except that Mr. Ridler would come to Mr. Price's office in Jefferson County. On July 22, 1961 Mr. Ridler appeared at Mr. Price's office. The parties proceeded to the farm, looked it over, and had lunch together, during which negotiations progressed. In their negotiations the parties were dealing at arm's length. During the negotiations Mr. Price was informed of the fact that the Ridlers had listed the property with Haag and Mr. Price was shown a copy of the listing contract, which had the figure $40,000 in it, but Mr. Price was informed that Mr. Haag had been notified to lower the price to $20,000

in view of the fact that no offers at the higher figure had been received. The Ridlers suggested that Mr. Price go with them to Mr. Haag to buy the property but Mr. Price did not want to go to Mr. Haag with his deal, and said they would "just leave Mr. Haag out of it." When liability for the payment of a commission to Mr. Haag was discussed Mr. Price suggested that he would wait until the listing contract expired before he would pay for the land in full; that if he bought it he would do so with the understanding that he would buy it directly from the Ridlers after January 1st, "therefore [the Ridlers] would not have to pay Mr. Haag [the] commission for selling it, that he [Mr. Price] would handle it for [the Ridlers]." Mr. Ridler said he would like to sell the land "right away" and pay the commission. Mr. Price "was still set on waiting until the end of the year." They finally agreed upon a sales price of $10,800, which they arrived at by deducting the amount of the commission from the $12,000 asking price ($12,000 less 10% or $1,200), acting on the assumption that by delaying the closing of the sale until the expiration of the listing contract the Ridlers would not have to pay the $1,200 commission to Mr. Haag. Mr. Price assured the Ridlers that they could "still sell" the property "up to the time of the contract," but claimed they would have to sell it for $40,000. (Later in the year Mr. Price told the Ridlers they could not sell the property; that it was his.) So on July 22, 1961 a sales contract was drawn and executed by Mr. Price and Mr. Ridler, and later signed by Mrs. Ridler, reciting the receipt by Mr. Price of $540 earnest money deposit as part of the cash consideration of $10,800 for the 257-acre farm, "which property is this day sold to said Homer V. Price." The balance was to be paid as of closing date, December 22, 1961, later amended by mutual consent to December 31, 1961. A date in late December was chosen by Mr. Price as the closing date under the mistaken impression that the listing contract terminated between the 1st and 15th of December. The following proviso was typed in a blank

space at the end of the printed form of the contract of July 22:

"Provided, however, that whereas the seller hereunder has previously entered into a contract with a certain realty company listing said property with such realty company for sale at a price of forty thousand dollars ($40,000.00), it is hereby understood and agreed that the existence of said listing contract is hereby acknowledged and it is further agreed that should said realty company arrange a sale on or before December 1, 1961, at the listed price of $40,000.00, commission provided under said listing contract shall be paid in full, date of closing hereunder being accelerated to conform to said sale and buyer hereunder performing as seller under said listing contract."

This instrument was filed for record in the Recorder's Office of Jefferson County on October 25, 1961. The $540 was paid by Mr. Price's check, on which there was a notation "Earnest money and part purchase money on 257 acres at $10,800 as per contract." The check was endorsed and cashed by Mr. and Mrs. Ridler.

During August, 1961 Haag Real Estate Company negotiated a contract for the sale of the farm to one Fred Simmons, but this sale was not consummated because of lack of financing.

Defendants' Exhibit C is a written contract, dated November 15, 1961, for the sale of the farm by the Ridlers to Gertrude Siebel for $19,500, reciting that a down payment of $2,000 had been received by Haag Real Estate Company. Gertrude Siebel was an employee in the Haag office. A deed from the Ridlers to Gertrude Siebel dated December 1, 1961, filed for record in the recorder's office December 22, 1961, was offered in evidence. The Ridlers did not receive any of the $2,000. They testified that it was to be "left in check form" until the litigation was settled.

In December 1961, prior to the closing date, plaintiff notified the Ridlers that he

was prepared to pay the balance due on the contract, and that the money would be on deposit at Jefferson County Abstract Company; that the papers would be ready for the Ridlers to execute and he would expect them to convey title to the farm to him at the closing on December 31, 1961. Plaintiff deposited the money at the abstract company but the Ridlers failed to consummate the transaction according to their contract and Mr. Price filed this suit on January 9, 1962, filing a notice of lis pendens on the same day. The property was thereafter conveyed by Gertrude Siebel to the other defendants named in this action.

Defendants seek a reversal of the decree of specific performance on two grounds.

■ First, defendants contend that plaintiff acted in bad faith and did not come into the court of equity with clean hands. This is said to arise because plaintiff, aware of the listing contract with Haag, "cut in and interfered with" that contract and connived to cheat the broker out of his commission by suggesting that no commission would have to be paid Haag if the sale were consummated after the listing had expired; suggested a reduction of the sale price by an amount exactly equal to the real estate broker's commission, and by placing the $40,000 figure in the contract forced Haag "to sell at $40,000.00 or nothing, thereby interfering to control the real estate broker's contract so that the broker could not make a commission on a sale of, for example, $30,000.00"; and that this underhanded practice cannot be condoned in a court of equity. While "He that hath committed iniquity shall not have equity,"[1] and while the clean hands doctrine is one of the foundation stones of equity jurisprudence, it has its limitations and "does not apply to every unconscientious act or inequitable conduct on the part of a plaintiff." Pomeroy's Equity Jurisprudence, 5th Ed., Vol. 2, § 399, p. 94. "The party to a suit, complaining that his opponent is in court with 'unclean hands' because of the latter's conduct in the transaction out of which the litigation arose, or with which it is connected, must show that he himself has been injured by such conduct, to justify the application of the principle to the case. The wrong must have been done to the defendant himself and not to some third party." Idem, § 399, p. 99; Schroeder v. Turpin, 253 Mo. 258, 161 S.W. 716 [8]. While plaintiff's attempt to circumvent Haag's rights under the listing contract and thereby avoid payment of a commission stands for disapproval, especially in view of the fact that plaintiff must have known better, having been engaged in the real estate business for fifteen years, the plain fact remains that plaintiff's conduct did not injure defendants; the wrong was done to a third party.

■ ■ Next, defendants contend that the contract between plaintiff and the Ridlers was oppressive, unfair, inequitable, unreasonable, an unconscionable bargain, one-sided, biting, overreaching; that it worked an unreasonable and disproportionate hardship upon defendants and placed them at the mercy of plaintiff. Specific performance of a contract having these qualities will not be decreed, but a careful review of the record does not lead to the conclusion that this contract is subject to this wholesale indictment.

■ We put aside Ridlers' testimony that Mr. Price informed them during the negotiations that the sale to him would be carried out only if the Ridlers could not sell their property for a better price before the end of the year, and that if they did sell their only obligation to him would be the return of the $540 earnest money payment, for the reason that this evidence, objected to, was inadmissible under the parol evidence rule. Commerce Trust Co. v. Watts, 360 Mo. 971, 231 S.W.2d 817, 820; Bank of Mountain View v. Winebrenner, 355 Mo. 79, 195 S.W.2d 486, 490.

---

1. Anno. 4 A.L.R. 46, 85.

■ Defendants contend that "an unconscionable bargain was made by the wise and sharp plaintiff who found the defendants in financial hardship and ignorant of what they were signing." The evidence does not support this contention. There is nothing to indicate that plaintiff was "wise and sharp" in the sense suggested or that the Ridlers were lacking in business acumen; or that plaintiff was more than a match for the Ridlers in business matters or that he took advantage of "ignorant and destitute people" to drive an unconscionable bargain, as claimed. Nor is there support for defendants' claim that the Ridlers were "poor and uneducated" laymen and that the quoted provision of the contract was incapable of being understood by them. The evidence of their education and ability to understand shows that Mr. Ridler had the equivalent of a 4-year high school education. An electrician by trade, he was in the U. S. Navy for approximately 20 years, where he had training in electrical work. His testimony indicates that he is an intelligent person with a better than average education and understanding. Mrs. Ridler attended high school and her testimony reveals an intelligent person of average or better than average understanding. There is nothing to show that the Ridlers were ignorant of what they were signing. Instead, their testimony indicates they were fully informed as to the terms of the contract. Mr. Ridler testified that he and Mr. Price were dealing at arm's length.

There is nothing in the record to support the suggestion that the Ridlers were suffering from financial hardship. Mr. Ridler testified that he had no steady employment since the employees went on strike at General Electric (at a date unspecified); that he had been working at small jobs, and Mr. Price testified that Mr. Ridler told him he was "somewhat pressed" for money. This does not prove financial hardship or that the Ridlers were destitute, as claimed.

Defendants assert that a decree of specific performance would produce injustice and work a hardship on defendants by forcing them to sell their land for an amount equal to less than one third of its value; that "[c]onsidering the increase in land values in Jefferson County within the past ten years, the property could easily be worth $30,000–$40,000. Even on a quick forced sale which the Ridlers thought was necessary to prevent Price from confiscating the property for $10,800 the Ridlers were able to obtain $19,500.00 for the acreage." There is no substantial evidence to support these statements. The evidence is that in 1953 Mr. Ridler bought the land for $16,500 (or less); that in 1961 he valued the land at $12,000 and after arm's length bargaining arrived at a sales price of $10,800 by reducing the $12,000 by the amount of a 10% real estate commission; that on July 22, 1961 the reasonable market value of the land was between $10,000 and $15,000, and that a short time before trial plaintiff had testified in another lawsuit that 171 acres of land in the same county, some three miles from this farm, but not as level land, were worth $171,000. There is nothing to show that the 171-acre tract was comparable to the 257-acre tract in location, fertility, general adaptability or potential uses. The evidence, on the contrary, is that the 257-acre farm was poor in fertility, not located as well, and that land in the area around it had been selling for $40 an acre "lately." Defendants argue that Haag, under the listing contract, negotiated a sale of the property on November 15, 1961, during the contract period, "and consummated the sale the following month for the price and sum of $19,500." The evidence is not convincing that there was a genuine, bona fide sale for $19,500. While Exhibit C, a sales contract, recites such a sale and that a $2,000 check purporting to be a down payment was issued, the transaction does not ring true. The alleged purchaser, Gertrude Siebel, was an employee in the office of Haag Real Estate Company. The $2,000 check was never cashed. None of the $19,500 has ever been paid to Haag or to the Ridlers. Mr. Ridler concedes that the check is being held pending the outcome of this litigation. Although the deal was never closed, the

Ridlers made a deed to Gertrude Siebel who, in turn, undertook to transfer title to others. When Gertrude Siebel's title was brought in question in this action she exhibited no interest in claiming title. Although named as a defendant in this suit and personally served with process she stood in default on the day of trial, filed no pleading, and did not appear. Her "grantees," the defendants Lorts and Kappler, were personally served with process, but they likewise failed to appear, filed no pleadings and defaulted.

■ In sum, the evidence of value does not support the conclusion that the Ridlers were forced to sell their land at an inadequate, confiscatory price, and that it would be inequitable to decree specific performance for this reason.

Defendants claim that the quoted proviso in the listing contract was "sharp practice" which made this a "one-sided contract" and unquestionably "placed the defendants Ridler at the mercy of the plaintiff"; that it forced defendants "to try to sell their property for $40,000, and no less, and even if they did sell, then the plaintiff was to receive the $29,200 profit"; that it is ambiguous, unclear, extremely puzzling and that it "reeks with trickery and fraud."

We do not find the language of the provision ambiguous or puzzling. It is clear and definite enough for ordinary understanding. The contract in suit, executed in acknowledgment of the provisions of the listing contract, was *subject to* the provisions of listing contract. In the event of a sale by the Ridlers under the listing contract Mr. Price was to step into the shoes of the Ridlers under that contract, perform as seller, pay all commissions due Haag, and take whatever profits might be involved. Mr. Price's rights to the property under his contract with the Ridlers were subject to the possibility of a bona fide sale under the listing contract. In that event the listing contract would take precedence. Such a sale, when consummated, would render impossible performance by the Ridlers under

their contract with Mr. Price. The contract in suit was thus conditional in the sense that it would be enforceable if there was no sale by the Ridlers under the listing contract.

■ Obviously the quoted proviso was advantageous to Mr. Price but it does not follow that its inclusion effected sharp practice, trickery or fraud, or made it a "one-sided" contract. By "one-sided" we assume defendants mean a contract in which all of the burdens and obligations were imposed on one party, whereas all of the benefits and considerations flowed to the other party. While the contract was advantageous to Mr. Price there were considerations and benefits flowing to the Ridlers. By this contract the Ridlers accomplished the sale of their property, "a consummation devoutly to be wished" by the Ridlers, if we correctly interpret their expressed desires. By Mr. Price's promise they were relieved of the obligation to pay a commission to Haag in case of a sale under the listing contract. In the absence of fraud, mistake, imposition, undue influence, overreaching, etc., or some impediment such as public policy, specific performance will not be denied on the ground that the parties who are sought to be held to their contract may have made a bargain less advantageous to them than to the party seeking enforcement.

We find no substantial basis for the assertion that the contract in question was unfair, oppressive, unconscionable and overreaching, and that it placed the Ridlers at the mercy of Mr. Price. It is a standard printed form of sales contract, with conventional terms, except for the quoted proviso. Defendants claim that the proviso forced upon them the alternative of holding out for $40,000 or missing a sale for a lesser amount. We do not find this claim accurate or relevant. It ignores the fact that by the execution of the contract in question the Ridlers sold the property conditionally under an agreement that the vendee step into their shoes as vendors under the

listing contract if Haag arranged a sale thereunder satisfactory to them. By this action the Ridlers effectively took themselves out of the picture as far as profits were concerned. Thereafter they had no reason to be particularly interested in any sale of the property by Haag, for they would not benefit therefrom. Thereafter Mr. Price was entitled to any profit realized by a sale under the listing contract for any amount over $10,800. The proviso did not force any alternative upon the Ridlers. They were not obligated to sell at any price, except for the maximum cash price of $40,000. Under the listing contract, and after the execution of the contract in suit, the Ridlers were free to sell or not to sell for any price less than $40,000. The language of the proviso "at the listed price of $40,000" is descriptive merely, not mandatory or exclusive. It must be held to have referred to a sale at the listed price, $40,000, or "such other price" as the vendors might accept. The proviso would not become operative until a bona fide sale was arranged under the listing contract, and in order for any sale at less than $40,000 to be made the Ridlers would have to agree to its terms. The argument that under the proviso they were forced to sell for $40,000 or not sell is not tenable.

The proof offered does not show that the "sale" in August, 1961 and the subsequent deed to Gertrude Siebel was a bona fide sale and conveyance. On the contrary, we find that it was a sham transaction, contrived for the purpose of relieving the Ridlers of their obligations under the contract in suit, and that there was no legal excuse for the refusal of the Ridlers to comply with their contract.

Summarizing, sui juris landowners desiring to sell their farm sought and found a prospective purchaser, made an offer, negotiated at arm's length, arrived at a price not shown to be unconscionably low, entered into a conditional contract which is clear and definite in its terms and not unreasonable, inequitable or overreaching. The condition which would have excused the vendors from performance not having occurred, the vendee having performed all of his obligations, and no impediment to specific performance appearing on any of the grounds assigned, this is a proper case for specific performance.

Judgment affirmed.

COIL and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.