Charlie WALLACE and Karla Wallace, Respondents/Cross–Appellants,

v.

Michael F. GRASSO and Cynthia Grasso, et al., Appellants/Cross–Respondents.

No. ED 80965.

Missouri Court of Appeals,
Eastern District,
Division One.

Oct. 28, 2003.

Joseph Burcke, Clayton, MO, for appellant.

David R. Bohm, Danna McKitrick, P.C., St. Louis, MO, for respondent.

ROBERT G. DOWD, JR., Judge.

Cynthia and Michael Grasso (collectively referred to as the Grassos) appeal from the trial court's judgment ordering the Grassos to remove a fence which ran in part along the property line of the Grassos and of Charlie and Karla Wallace (collectively referred to as the Wallaces). On appeal, the Grassos argue the trial court erred (1) in finding the Grassos's fence violated Sections 1003.105(3) and (4) of the ordinances of the City of Chesterfield, (2) in finding as a basis for its order enjoining the Grassos's fence the fence's aesthetic appearance, (3) in determining Paragraph

3 of the subdivision indentures provision was not waived by the prior conduct of the subdivision owners, (4) in finding the Grassos's contention that the Wallaces' themselves had unclean hands by building their home without adhering to Paragraph 3 of the indentures unpersuasive, and (5) in declaring that pursuant to Paragraph 16 of the indentures in all subdivision matters, excluding amendment of the subdivision indentures, the number of votes eligible to be cast was to be based on the number of lot owners and not the number of lots. On cross-appeal, the Wallaces argue the trial court erred in holding that it could not award punitive damages on their nuisance claim because no actual damages were found and because nominal damages were neither pleaded nor submitted.[1] We affirm in part and reverse and remand in part.

Viewed in the light most favorable to the verdict, the following evidence was adduced at trial. The Wallaces and the Grassos are abutting property owners in the Wildhorse Creek Heights Subdivision located in the City of Chesterfield, St. Louis County, Missouri. The Grassos own approximately nine acres of land on which they have constructed a single-family residence situated approximately in the middle of the parcel of land. In early 1997, the Wallaces purchased six acres of undeveloped land to the east of the Grasso property, sharing a border that runs the length of the eastern portion of the Grasso property and the western portion of the Wallace property. West of the property line lies a natural tree line that runs the length of the common border, leaving a portion of cleared Grasso property between the prop-

erty line and the trees. This tree line obscures the Grassos' view of the fence in question. The Grasso property had been developed prior to the Wallaces purchasing their parcel. In 1998, the Wallaces erected a single-family residential dwelling on their parcel of property. The Wallace property is located in a cul-de-sac. At the time the Wallaces purchased their property, there was no fencing around the Grasso property.

Prior to the Wallaces' occupying their residence, the Grassos owned two large German Shepherd dogs. On multiple occasions, as Karla Wallace, her children, or guests of the Wallaces walked or ran on the road that leads to their property and which passes in front of the Grasso property, the dogs would run out in the road and frighten them.[2] As a result of these incidents, the Wallaces asked Mr. Grasso to restrain his dogs, which he initially refused to do indicating the dogs were harmless. After further complaints, Michael Grasso informed Karla Wallace he was going to erect a fence. He stated he would erect a presentable fence along the front of his home and a "crappy" looking fence on the property line the Grassos shared with the Wallaces. The Wallaces warned the Grassos that the fence must be built in compliance with the relevant terms of the subdivision indentures and municipal ordinances.

In September 1999, Michael Grasso erected a fence along the perimeter of his property that included the property line shared with the Wallaces. He employed four different construction materials for the fence: a black aluminum material with the appearance of wrought iron along the

1. The Wallaces urge us to disregard any of the points in the Grassos' brief because of their alleged failure to comply with Rule 84.04. We feel Grassos' brief sufficiently complies with the rule.

2. While Michael Grasso denied many of these incidents occurred, the trial court disregarded much of his testimony finding it "replete with inconsistencies and untruths."

front of his property; wood stockade along the first 100 feet of the property line common with the Wallaces; galvanized silver chain link fence for the rest of the common line; and black chain link fencing to join the front fence to the side fence and to serve as the western side of the Grasso property. Appellant Grasso never submitted any construction plans for his fence to any trustee or resident of the subdivision to ensure the fence was of good quality and in harmony with the neighborhood, as prescribed by the indentures. The Wallaces testified that despite the erection of the fence, the Grassos' dogs continued to menace and frighten them and continued to exceed the Grassos' property lines.

This case was tried on the Wallaces' second amended petition. The petition was in two counts. The first count sought injunctive relief to remedy breach by the Grassos of the subdivision indentures, maintenance of a private nuisance, removal of Michael Grasso from his purported position as subdivision trustee, and declaratory relief requesting the identity of the trustee as well as clarification of the voting power of each property owner in the subdivision according to the indentures.[3] The second count sought damages for nuisance and breach of fiduciary duty. The Grassos' sole affirmative defense alleged that the Wallaces should be denied injunctive relief because they had unclean hands as a result of their failure to submit plans to, or seek approval from, the subdivision trustee for construction of their home.

The trial court empanelled an advisory jury to hear the Wallaces' damage claims, with the trial court reserving to itself all equitable issues. The jury found Michael Grasso liable for nuisance arising from construction and maintenance of the fence and awarded the Wallaces 135,000 dollars in actual damages and zero dollars in punitive damages. The jury also found Michael Grasso liable for nuisance arising from his allowing his dogs to roam loose through the neighborhood and awarded the Wallaces zero dollars in actual damages and 75,000 dollars in punitive damages. The trial court issued its findings of fact and conclusions of law in which it stated that the jury was advisory, so that it had no duty to enter judgment on the jury verdict. The trial court granted injunctive relief for violation of the subdivision indentures and the City of Chesterfield zoning ordinance, denied all monetary relief and construed the provisions of the indentures to require election of three trustees, with each property owner to have one vote (regardless of the number of lots owned by said person). This appeal follows.

A court-tried case is reviewed under the standards set forth in *Murphy v. Carron,* 536 S.W.2d 30 (Mo.banc 1976). We must affirm the trial court's judgment unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Id.* at 32. Because of the trial court's superior ability to determine the credibility of witnesses, we must defer to the trial court's findings of fact. *Moore v. Weeks,* 85 S.W.3d 709, 716 (Mo.App. W.D.2002). We view the evidence and all reasonable inferences therefrom in the light most favorable to the trial court's judgment, while disregarding all contrary evidence and inferences. *Id.*

The Wild Horse Creek Heights subdivision is within the "NU" district of the City of Chesterfield. The Chesterfield ordinance applicable to the erection of fences

---

**3.** John and Cindy Morgenthaler, Jim and Kim Grasso, and Larry and Terri Mintz were named as defendants solely because of the Wallaces' request for declaratory relief, relating to the interpretation of portions of the subdivision indenture.

is found in Section 1003.105(3)(a) and (b) and (4)(b) of the City of Chesterfield Zoning Code, which states in pertinent part:

(3) Minimum yard requirements; general

(a) Front yard. No structure shall be allowed within fifty (50) feet of any roadway right-of way-line.

(b) Side and rear yard. No structure shall be allowed within twenty (20) feet of any property line other than a roadway right-of-way line.

(4) Specific yard requirements and exceptions.

(b) Boundary walls or fences, six (6) feet or less in height, are allowed within the minimum yard requirement.

The subdivision indentures for Wild Horse Creek Heights Subdivision state, in pertinent part, as follows:

Paragraph 1(c). "Improvements" shall include, but not be limited to all structures, signs, driveways, electrical taps [sic] sanitation facilities, fences, walls, swimming pools, tool sheds, garages, barns, landscaping, fuel tanks, dams, and radio and television aerials and antennae;

Paragraph 3. ARCHITECTURAL CONTROL. No Improvement shall be erected, placed or altered on any Lot until one copy of the construction plans and specifications, showing the location of the Improvements, and landscape design plans showing trees retained and trees to be removed within required front [sic] side and rear yards, have been submitted to the Trustee and approved by it in writing as to the quality of workmanship and materials, harmony of external design and landscaping with existing structures and landscaping, and location of topography and finish grade elevations. Trustee shall retain the copy of all such plans. Trustee shall

review any such plans and specifications within forty-five (45) days following receipt thereof in proper form. If the Trustee fails to reject such plans in writing within such period, the plans shall be deemed approved. All approved plans, specifications, and plot plans must be strictly followed and no Improvement may be changed or altered without written approval of Trustee.

Paragraph 4(b). No fence shall be erected or altered on any lot unless approved by Trustee as provided in section 3 hereof. All fences within One Hundred (100) feet or less of any road shall be of wood or ornamental iron and of uniform height, unless Trustee, giving due regard to landscaping harmony, establishes other permissible types. Any fence to confine animals or children shall be in addition to the wood or ornamental iron fence and placed inside thereof.

Paragraph 5. STRUCTURE LOCATION. Without written approval of Trustee, no Improvement may be erected on any Lot nearer to any roadway or right-of-way line than the building lines shown on the Plat nor nearer to any side or property lines than permitted by Ordinances applicable to the Subdivision on the Recording Date.

Paragraph 9. NUISANCES AND INTERFERENCE WITH THE PROPERTY AND ACTIVITIES OF OTHERS. No nuisances (as determined in the judgment of Trustee, whether or not a nuisance at law) noxious or offensive activity shall be allowed on any Lot, nor shall anything be done thereon which is or may become an annoyance or nuisance to any other Owner.

Paragraph 16. TRUSTEE. The Trustee shall be Wild Horse Creek Heights Homeowners Association, or any successor Board of Trustees or Missouri Corporation, whose Articles of Incorpo-

ration or an instrument of trust takes possession of the duties outlined herein after Hahn Construction has sold all the lots and is no longer a land owner in the Wild Horse Creek Heights development. The Trustees designated and selected shall be chosen by purchasers of developed lots after all the lots have been sold. The Trustees shall serve a one-year term and at the annual meeting elections will be held for elections and/or reelection of the Trustee. An emergency meeting may be called by the Trustees in order to fill a vacancy if the majority so desires. . . .

Paragraph 17. AMENDMENT. This Indentures and any part thereof may be altered, amended, extended, changed or discontinued by a written agreement signed by not less than 75% of the then recorded owners of the fee simple title to all lots in the tract; any such signed written signed alterations, amendments, extensions, changes or discontinuance shall when duly certified and acknowledged by the Trustees and recorded in the off ice of the Recorder of Deeds for St. Louis County, Missouri become a part of the provisions and covenants of this Indentures.

In their first point, the Grassos argue the trial court erred in finding the Grassos' fence violated Sections 1003.105(3) and (4) of the ordinances of the City of Chesterfield. Specifically, they contend the trial court's finding that the fence was erected "well within twenty feet of Plaintiff's property line" is a misconstruction of the ordinances. In their response, the Wallaces do not dispute the trial court misconstrued the Chesterfield zoning ordinance when it held the fence was erected contrary to the requirements of that ordinance as it was constructed within the required side yard. However, they argue, the fact the trial court found the fence was constructed in violation of the subdivision indentures is a

sufficient basis to uphold the injunction issued by the trial court.

 As the Wallaces correctly point out, the Grassos have not challenged the trial court's finding that he erected a fence contrary to Paragraph 3 of the subdivision indentures which requires him to submit a copy of the construction plan to the Trustees for review regarding quality of workmanship and materials as well as the harmony of external design with existing structures and landscaping. The evidence reveals that the Grassos did not submit fence plans for review by the subdivision Trustees or by anyone else in the neighborhood. This conclusion, alone justifies the trial court's decision to require removal of the fence. "(E)quity will enjoin the violation of restrictive covenants irrespective of the amount of damage which would result from a breach, and even though there be no substantial monetary damage." *Gibbs v. Cass,* 431 S.W.2d 662, 669 (Mo. App.1968). Further, there was substantial evidence to support the trial court's conclusion that the varying styles of fencing were not in harmony with the other structures and landscape in the subdivision. Appellant Grasso told Karla Wallace that he intended to put up a "crappy" fence along the property line. Also, there was substantial testimony by the Wallaces and Larry Mintz (Mintz) as to how the fence was not in harmony with the other improvements and the landscaping in the neighborhood.

Considering the indenture violations committed by the Grassos in erecting and maintaining their fence, the trial court's issuance of a mandatory injunction directing the fence be removed is supported by the evidence. Point one is denied.

 In their second point, the Grassos argue the trial court erred in finding as a basis for enjoining the Grassos' fence its

aesthetic appearance, as the trial court was precluded from finding visual appearance to be either a nuisance or an acceptable basis for an order enjoining the fence's existence. We disagree.

■ A nuisance cannot be based solely on aesthetic considerations. *Rosenfeld v. Thoele*, 28 S.W.3d 446, 450 (Mo.App. E.D. 2000). Here, the trial court's injunction was not based solely on aesthetics. Instead, the trial court found the fence erected by the Grassos violated the provision of the indentures requiring improvements to be in harmony with other structures and the landscaping in the subdivision. As such, the basis for the mandatory injunction issued by the trial court was proper based on the violation of the indentures. Point two is denied.

In their third point, the Grassos argue the trial court erred in determining Paragraph 3 of the indentures was not waived by the prior conduct of the subdivision owners. They contend that because the trial court made a specific finding that none of the subdivision owners observed this indenture requirement in the construction of their homes and because there was testimony that at least one other fence of multiple material construction had been built by another lot owner without submission of plans to a Trustee, the subdivision lot owners had effectively abandoned this requirement of the indentures. We disagree.

■ Waiver, generally, and waiver or abandonment of a restrictive covenant, specifically, constitutes an affirmative defense. *Moore*, 85 S.W.3d at 721. An affirmative defense or avoidance must be set forth in a pleading that contains "a short and plain statement of the facts showing that the pleader is entitled to the defense of avoidance." Rule 55.08. "The factual basis for defenses must be set out in the same manner that is required for pleading claims." *Leiser v. City of Wildwood*, 59 S.W.3d 597, 605 (Mo.App. E.D.2001).

■ Here, the answer filed by the Grassos to the Second Amended Petition did not assert the affirmative defense of waiver or abandonment of the restrictive covenants.[4] Instead, the only affirmative defense asserted by the Grassos was that the Wallaces had unclean hands so as to preclude the trial court from granting them equitable relief. Because the Grassos failed to plead the affirmative defense of waiver or abandonment of the restrictive covenants, they cannot be heard to claim such waiver or abandonment on appeal.

■ Even if, as the Grassos argue, the issue of waiver was tried by implied consent, their argument still fails. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Rule 55.33(b). "In order to find an amendment of the pleadings based upon implied consent, the evidence presented must bear solely on the proposed new issue and must not be relevant to another issue already in the case." *Rudin v. Parkway School Dist.*, 30 S.W.3d 838, 841 (Mo. App. E.D.2000). "Unless it clearly appears that plaintiff tacitly agreed to join issues in such affirmative defenses, consent to the trial of non-pleaded affirmative defenses should not be held to be implied." *Duncan v. Price*, 620 S.W.2d 70, 71 (Mo. App.1981).

■ Here, the evidence the Grassos cite in support of their claim of waiver or

---

4. In their reply brief, the Grassos admit that the issue of waiver was not pleaded as an affirmative defense.

abandonment of the restrictive covenant is also relevant to other issues in the case; specifically, the evidence concerning the informality of the operation of the Homeowners Association, the failure to elect Trustees, and the testimony that no homeowners had submitted any proposed improvements to a homeowner Trustee for approval all relate to Appellant Grassos' intent in erecting the fence and whether or not his conduct was malicious. As the cited testimony did not relate solely to waiver of the restrictive covenant, it cannot be said the Wallaces impliedly consented to trial of that issue.[5]

■■■■ Even assuming the issue of waiver of the restrictive covenants was tried by implied consent, the Grassos's evidence at trial was insufficient to establish waiver of the architectural control and fencing provisions of the indentures.[6] Enforcement of valid restrictive covenants may be denied only when non-compliance is

> ... so general as to indicate an intention or purpose ... to abandon the condition. Defendant has the burden of proving (1) a radical change in conditions as they were originally set forth in the covenant, (2) that enforcement would cause undue hardship to the defendant, and (3) that enforcement would provide no benefit to the plaintiff. Otherwise the condition

must be enforced even though the plaintiff has not proved any actual damage from its breach. *Gibbs*, 431 S.W.2d at 670.

To support their claim of waiver, the Grassos presented the following evidence: that none of the homeowners submitted building plans for their homes to a Trustee for approval, that they constructed their pool and tennis court without submitting plans for approval, and that Mintz put up a decorative fence on his property without submitting plans to a Trustee for approval.

The Grassos argue that since 100 percent of the homeowners had allegedly ignored the provisions concerning submitting their building plans for approval, this was sufficient to constitute waiver of the relevant provisions. However, as the Wallaces point out, the Grassos ignore the context of the alleged failure of property owners of Wild Horse Creek Heights subdivision to submit building plans for approval to the subdivision Trustee. Wild Horse Creek Heights was a relatively new subdivision and the Homeowners Association did not become the Trustee under the indentures until after all of the lots in the subdivision were sold, sometime in 1998.[7] Until that time the indentures did not provide for any Trustee. Thereafter, no Trustee was elected by the Homeowners Association until at least sometime in 1999,

---

5. We are not persuaded by the Grassos' argument that the requirement of single-issue applicability does not apply in the instant case because there was no surprise as to the waiver issue. See *Richardson v. Collier Bldg. Corp.*, 793 S.W.2d 366, 373 (Mo.App. W.D. 1990).

6. A party asserting waiver of restrictive covenants in a subdivision indentures has the burden of proving waiver. *Moore*, 85 S.W.3d at 721.

7. The Grassos challenge the assertion that there was no Trustee provided by the subdivision indentures until the last lot in the subdivision was sold. They argue that Paragraph 1(i) of the indentures defined Hahn Construction as the original trustee and all successor trustees were those appointed pursuant to Paragraph 16 or organized after Hahn Construction had relinquished control of the Homeowners Association upon the sale of the last lot. Nowhere in the indentures is Hahn Construction defined as Trustee. Indeed, Hahn Construction is explicitly defined as "Grantor" while the Wild Horse Creek Heights Homeowners Association is designated as "Trustee."

after all of the homes in the subdivision had been constructed and, apparently, after Mintz had installed his ornamental fence. Nor was there ever any objection by any property owner in the subdivision to any improvement prior to the Wallaces becoming aware of the Grassos' plans to erect a "crappy" fence, to which they objected.

Further, the decorative fencing installed by Mintz is not comparable to the fence installed by the Grassos along the property line between their property and the Wallaces. Mintz has several sections of what appears to be a wood rail fence by his driveway, near his mailbox. He also put up a decorative aluminum fence that looked like wrought iron near his house. No one has complained about the fences that Mintz erected. Most importantly, when Michael Grasso commented about these fences at a homeowners meeting, Mintz offered to take them down, but Michael Grasso said nothing in response to the offer.

Here, the Wallaces' efforts to enforce the restrictions of the subdivision indentures is inconsistent with waiver or abandonment. *See Eichelsbach v. Harding,* 309 S.W.2d 681, 685 (Mo.App.1958) (holding that "Whether there has been such acquiescence to constitute relinquishment, waiver or abandonment of restrictions depends upon the circumstances of each case.") In fact, the Wallaces started to insist that the Grassos comply with the provisions of the subdivision indentures controlling erection of fences in the subdivision starting no later than March 1999 when they sent a letter to John Morgenthaler, in the mistaken belief that he was the subdivision Trustee, approximately two months after the Wallaces moved into their home. Thereafter, the Wallaces repeatedly asked or warned the Grassos to comply with the subdivision indentures with regard to erection of his fence.

Finally, the property owners' failure to submit home construction plans for Trustee approval prior to the time their homes were constructed at a time when no Trustee existed in the Wild Horse Creek Heights subdivision, does not indicate an intention or purpose by the homeowners to generally abandon the architectural control or fence provisions of the indentures. We find no error. Point three is denied.

■ In their fourth point, the Grassos argue the trial court erred in finding the Grassos' contention that the Wallaces themselves had unclean hands by building their home without adhering to Paragraph 3 of the indentures unpersuasive. Specifically, they contend that because the Wallaces failed to observe Paragraph 3, they were legally precluded from citing this provision as the basis for injunctive relief. We disagree.

In *Nelson v. Emmert,* 105 S.W.3d 563, 568 (Mo.App. S.D.2003), the court made an exhaustive review of the case law relating to the unclean hands doctrine, stating that:

> ... the doctrine of unclean hands requires that a party coming into a court of equity must have acted in good faith as to the subject matter of the lawsuit. *Crawford v. Detring,* 965 S.W.2d 188, 193 (Mo.App.1998). The doctrine is not one of absolutes, however, but can be utilized in the discretion of a court of equity. *Colbert v. Nichols,* 935 S.W.2d 730, 734 (Mo.App.1996); 30 C.J.S. *Equity* §§§§ 111, 114 (1992); Henry L. McClintock, Principles of Equity §§ 26 (2d ed.1948). The doctrine "does not apply to every unconscientious act or inequitable conduct on the part of a plaintiff." *Price v. Ridler,* 373 S.W.2d 59, 62 (Mo.1963) (quoting 2 Pomeroy's Equity Jurisprudence §§ 399 at 94 (5th ed)). As such, the doctrine should be

applied when it promotes right and justice by considering all of the facts and circumstances of a particular case. *Durwood v. Dubinsky*, 361 S.W.2d 779, 791 (Mo.1962); *Colbert*, 935 S.W.2d at 734; 30A C.J.S. §§ 111. In some instances, the "hoary and murky doctrine" of unclean hands was held inapplicable when the alleged misconduct did not injure the party defendants. *Osterberger v. Hites Const. Co.*, 599 S.W.2d 221, 229[19] (Mo.App.1980); see also *Price*, 373 S.W.2d at 62 (holding "wrong must have been done to the defendant himself and not to some third party"); *Simcox v. Obertz*, 791 S.W.2d 440, 443 (Mo.App. 1990) (holding doctrine inapplicable where alleged misconduct did not affect defendants). In other instances, the doctrine was not invoked in the presence of exceptional circumstances because to do so would work an injustice and a wrong. *Smith v. Holdoway Const. Co.*, 344 Mo. 862, 129 S.W.2d 894, 902 (1939).

Here, there was no evidence that the Wallaces were ever asked to submit plans for their homes to a Trustee for the subdivision. The Grassos never requested that the Wallaces submit their plans to the subdivision Trustee nor was there any complaint ever made to the Wallaces concerning their failure to get architectural approval for their home. Further, as mentioned above, there apparently was no position of Trustee of the subdivision until after Hahn Construction sold the last lot in the subdivision, and no Trustee was elected until at least sometime in 1999, after the Wallaces' home had been completed. Thus, there was no Trustee to whom the Wallaces could have submitted their building plans.

As correctly pointed out by the Wallaces, the case relied upon by the Grassos in support of their claim of unclean hands, *Compton Hill Imp. Co. v. Tower's Ex'rs*, 158 Mo. 282, 59 S.W. 239 (1900) is distinguishable from the case at bar. In *Compton*, plaintiff was suing to prevent defendant from subdividing platted lots in a subdivision pursuant to a restrictive covenant prohibiting re-subdivision of the lots. Plaintiff's predecessor in interest had previously re-subdivided lots in the same subdivision. In finding that plaintiff had unclean hands, the court stated that plaintiff stood,

> ... in the attitude of having violated the terms and restrictions of the identical contract, and in the same way which it seeks to enjoin defendant from violating. Specific performance in such a case is refused upon the ground that plaintiff does not come into court with clean hands.

Id. at 241.

Unlike in *Compton*, here the Wallaces had not erected a fence in violation of the indentures as the trial court found the Grassos had done. The trial court properly rejected the defense of unclean hands asserted by the Grassos. Point four is denied.

In their fifth and final point, the Grassos argue the trial court erred in declaring that pursuant to Paragraph 16 of the indentures in all subdivision matters, excluding amendment of the subdivision indentures, the number of votes eligible to be cast was to be based on the number of lot owners and not the number of lots. We disagree.

Paragraph 16 states, in relevant part, that: "The Trustees designated and selected shall be chosen by purchasers of developed lots after all the lots have been sold ..." The word "Lot" is defined in Paragraph 1 of the indentures to mean "any Lot shown on a Plat subject to this Agreement, now or hereafter." The use of the word "developed" to modify the word "lots" means that the indentures intended

something other than voting based upon the number of lots owned by any one person or family, as urged by the Grassos.

■■■■ In construing the terms of a restrictive covenant, we must give each word effect, and not treat any word as surplusage, unless necessary to avoid discrepancies or inconsistencies. *Forst v. Bohlman*, 870 S.W.2d 442, 446 (Mo.App. E.D.1994). The Grassos claim the trial court erred when, in construing the subdivision indentures, it declared that "for the selection of trustees, each property owner has one vote."[8] The Court further clarified its declaration when it stated that, "[t]he owners of each developed lot shall designate one individual to vote in any subdivision matters." Here, the language of the indentures clearly intended that the owner of each lot on which a home was built would be entitled to a vote for the trustees. The trial court's declaration as to voting for subdivision trustees was proper. Point five is denied.

■■■■ On cross-appeal, the Wallaces argue the trial court erred in holding that it could not award punitive damages on their nuisance claim because no actual damages were found and because nominal damages were neither pleaded nor submitted. Specifically, the Wallaces argue that such a holding misstates and misapplies the law because (1) the trial court found that Grasso had created a nuisance, (2) nominal damages are presumed upon proof of nuisance, (3) it is unnecessary to plead nominal damages in order to be awarded nominal damages, and (4) the failure to submit the issue of nominal damages to the jury is of no import in that the jury was merely advisory. We agree.

The trial court submitted to the advisory jury two separate verdict directors on the Wallaces' nuisance claims. The first verdict director related to the issue of the spite fence. The second verdict director related to the issue of Grasso permitting his dogs to run loose outside of his yard. The jury found that the Wallaces suffered a total of 135,000.00 dollars in actual damages as a result of the construction of the fence. The jury found no actual damages as a result of the dogs running loose, but did return a punitive damage award in favor of the Wallaces in the total amount of 75,000.00 dollars.

■■■■ As the trial court correctly held in its judgment, because the Wallaces had requested equitable relief as well as damages, the jury was advisory only. Once equity jurisdiction attaches, a court of equity will retain jurisdiction to afford complete relief, even though it involves adjudicating matters of law or rendering a money judgment. *Willman v. Sloan*, 574 S.W.2d 421, 422–423 (Mo.1978). This is particularly true where there is a prayer for both equitable relief and damages. *Metropolitan St. Louis Sewer District v. Zykan*, 495 S.W.2d 643, 658 (Mo.1973).

In its conclusions of law, the trial court held that:

> Because no actual damages were found, this court cannot consider punitive damages (After the evidence was presented, Plaintiffs now request this court to find nominal damages and to thereafter base an award of punitive damages. Because 'nominal damages' were neither pleaded nor submitted, this court cannot grant such an award).

■■■■ Comment to MAI 22.06 provides, "Damage from a private nuisance is pre-

---

**8.** The Grassos apparently do not challenge that portion of the declaration that deter-

mines there should be three trustees.

sumed ... from the mere proof of nuisance." In *Hawkins v. Burlington Northern, Inc.*, 514 S.W.2d 593, 603 (Mo.1974) the court, citing to MAI 22.06, held that proof of actual damages was not necessary in a nuisance case because "it is not an essential element to plaintiff's case plaintiff's may be entitled to at least nominal damages." Therefore, it is not necessary to plead nominal damages in order to recover them, and a plaintiff is entitled to nominal damages if he proves nuisance but fails to, or cannot, prove actual damage. *Wear v. Walker*, 800 S.W.2d 99, 101–102 (Mo.App. S.D.1990).

Here, because the jury was merely advisory, the trial court was the ultimate finder of fact. Thus, whether or not the jury was instructed regarding nominal damages is irrelevant as to the trial court's right to grant nominal damages to the Wallaces. The trial court erred in concluding that it did not have authority to grant nominal damages on the nuisance claims.

▬▬▬▬ Further, there was ample evidence to support a finding that both Grasso's failure to contain his dogs and his erection and maintenance of the spite fence constituted nuisances. "Nuisance is the unreasonable, unusual, or unnatural use of one's property so that it substantially impairs the right of another to peacefully enjoy his property." *Crutcher v. Taystee Bread Co.*, 174 S.W.2d 801, 805 (Mo. banc 1943). The focus is on defendant's unreasonable interference with the use and enjoyment of plaintiff's land. *Frank v. Environmental Sanitation Management, Inc.*, 687 S.W.2d 876, 880 (Mo. banc 1985).[9]

Here, the fence is clearly a nuisance as it interfered with the Wallaces' use and enjoyment of their property. In addition, in failing to contain his dogs and allowing them to run loose in the streets and on the Wallaces property, Grasso violated two Chesterfield ordinances, Nos. 148 and 149. Ordinance No. 148 makes it a misdemeanor for anyone with responsibility for a dog to allow it to be at large. Ordinance No. 149 prohibits anyone with responsibility for a dog from allowing it to create a nuisance. The ordinance states that a dog will be considered to create a nuisance if it "chases vehicles, including bicycles," or if it "Molests ... or interferes with persons or other animals on public property or property not belonging to a person responsible for the animal."

There was testimony the dogs chased the Wallace children on their bicycles when they rode in the cul de sac or on the street and chased and menaced Wallace visitors when they were running or walking on the street. Moreover, the testimony of Mintz established that the dogs had been running loose in the subdivision and menacing residents and their visitors well before the Wallaces had moved into the neighborhood. There was also testimony that the dogs frequently got into the Wallaces' yard, both before and after the fence was constructed. There was evidence that the Grassos had created a nuisance prohibited by both Ordinances 148 and 149, or at the very least had created an unreasonable use of their property which interfered with the quiet use and enjoyment by the Wallaces of their property.

The transcript is replete with testimony concerning requests made to Grasso over a number of years, first by Mintz and then by the Wallaces to contain his dogs on his

9. Grasso argues nominal damages cannot be awarded unless the Wallaces prove some actual loss or detriment resulting from his conduct. This is so, contends Grasso, because pecuniary damages are an essential element of the Wallaces' nuisance claim. We disagree. Indeed, if proof of actual damages was a prerequisite to a grant of nominals, the most intolerable of nuisances would be without redress.

property. Grasso himself witnessed the interaction between one of his dogs and Christian Wallace on one occasion when, as Karla Wallace testified, the dog "nipped" at Christian's bottom. Further, Grasso testified that his dogs chased deer and that he had told the Wallaces the dogs probably thought their children were deer. Under these circumstances, a reasonable landowner would have made an effort to contain his dogs. However, rather than taking measures to adequately contain his animals, Grasso constructed a partially-enclosed fence that allowed the dogs to escape from his yard.

The trial court erred by not entering nominal damages with regard to both the claim for nuisance resulting from Grasso allowing his dogs to run loose and the claim relating to erection of the spite fence. We remand to the trial court with instructions to enter judgment for nominal damages in favor of the Wallaces on their nuisance claims and, further, to consider whether to award punitive damages to the Wallaces, based on the evidence adduced at trial.

Affirmed in part and reversed and remanded in part.

GARY M. GAERTNER, SR., P.J. and MARY R. RUSSELL, J., concur.