SUNBELT ENVIRONMENTAL
SERVICES, INC., Plaintiff–
Respondent,

v.

RIEDER'S JIFFY MARKET, INC.,
Charles F. Rieder, Trustee of the
Charles F. Rieder Trust dated the 19th
day of April, 1993, and Ozark Moun-
tain Associates, Inc., Defendant–Ap-
pellants.

No. 25939.

Missouri Court of Appeals,
Southern District,
Division Two.

June 29, 2004.

Kevin Checkett, Checkett & Pauly, P.C., Carthage, MO, for appellants.

Stuart H. King, McDonald & Hosmer King Royce, P.C., Springfield, MO, for respondent.

JAMES K. PREWITT, Judge.

Rieder's Jiffy Market, Inc. ("Jiffy Market"), Charles F. Rieder, as Trustee of the Charles F. Rieder Trust dated April 19, 1993 ("Trustee"), and Ozark Mountain Associates, Inc. ("OMA") appeal from a November 10, 2003, judgment granting the motion for creditor's bill filed by Sunbelt Environmental Services, Inc. ("Sunbelt"). Within the judgment, the trial court pierced the corporate veil of Jiffy Market

and OMA, and declared that Jiffy Market, OMA, and Trustee were "deemed to be one and the same."

Jiffy Market, OMA, and Trustee raise three points in this appeal. Points I and II are similar and assert that the trial court erred in its interpretation and application of § 428.024, RSMo 2000, and in assessing liability against Trustee and OMA, respectively, because there was insufficient evidence to pierce the corporate veil and assess the liability of Jiffy Market against them. In Point III, Trustee argues that the trial court was without jurisdiction to enter judgment against him because the pleadings and allegations filed before the court sought judgment against Charles Rieder individually and not as Trustee.

### Background and Procedural History

On April 17, 1997, Sunbelt filed an action for breach of contract against Jiffy Market and Trustee following a dispute over payment for environmental remediation work after a gasoline spill. The jury returned a verdict in favor of Sunbelt on its breach of contract claim against Jiffy Market for $67,524.20. On Sunbelt's *quantum meruit* claim against Trustee, the jury returned a verdict in Trustee's favor.

In February 1998, an execution was issued on the above judgment against the property and assets of Jiffy Market. The execution was returned unsatisfied by the Taney County Sheriff. On April 3, 1998, Sunbelt sent out a writ of garnishment, which was returned showing no assets under Jiffy Market.

On July 14, 1998, Sunbelt filed a motion for creditor's bill against Jiffy Market, Trustee, and OMA. Within the motion, Sunbelt alleged that the assets of Jiffy Market had been fraudulently transferred to OMA in an attempt to defraud, hinder, or delay Jiffy Market's creditors and that

Charles Rieder had formed both Jiffy Market and OMA for the same reason. Sunbelt's prayer for relief asked the court to declare "that all assets in possession of [Jiffy Market, OMA,] or Charles Rieder personally are subject to execution to satisfy" the previous judgment against Jiffy Market.

Following a hearing on the motion for creditor's bill, the trial court filed its judgment on February 21, 2002. The trial court pierced the corporate veil of Jiffy Market and OMA and found that Jiffy Market, OMA, and Charles Rieder were "one and the same."

That judgment was appealed to this Court. *See Sunbelt Envtl. Serv., Inc. v. Rieder's Jiffy Mkt., Inc.*, 106 S.W.3d 556 (Mo.App.2003). The appeal was dismissed based on this Court's determination that the trial court's order was not a final judgment because the judgment did not dispose of the claim against Trustee; "[i]n short, the judgment does not mention Trustee." *Id.* at 557.

Following the issuance of the opinion referenced above, on November 10, 2003, the trial court entered a judgment in which it pierced the corporate veil of Jiffy Market and OMA, and declared that Jiffy Market, OMA, and Trustee were "deemed to be one and the same." The judgment further stated, "The assets of said corporate entities and Charles F. Rieder, Trustee are subject to execution to satisfy the judgment entered herein."

This appeal followed.

### Discussion

As this was a judge-tried case, we will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Feinberg v. Feinberg*, 924 S.W.2d

328, 329 (Mo.App.1996). Due deference is given to the trial court's ability to judge the credibility of the witnesses and evidence before it. *Id.* Further, we will view the evidence and any reasonable inferences in the light most favorable to the prevailing party and disregard all contradictory evidence. *Id.*

Jiffy Market, Trustee, and OMA raise three points on appeal. We find it most logical to address Point III first. Following that analysis, we will discuss Points I and II together.

*Point III—Trial court without jurisdiction to enter judgment against Trustee*

██ Within this point it is argued that the trial court erred in assessing liability against Trustee because the trial court was without jurisdiction to enter judgment against him. The point further alleges that Trustee was without notice of the claims against him because, although he was named in the case caption as a party, Sunbelt's motion for creditor's bill made no allegations nor any prayer of relief against Trustee, as the pleadings and allegations filed before the trial court sought judgment only against Charles Rieder personally.

Trustee argues that the judgment here exceeded Sunbelt's prayer for relief in its motion for creditor's bill, as the pleadings did not ask for relief against Trustee. Trustee cites to specific cases for his assertion, including one that notes the well-established precedent that the judgment may not exceed the prayer. *First Missouri Bank of St. Francois Co. v. Patterson,* 696 S.W.2d 800, 801 (Mo.App.1985). However, as indicated in that case, that precedent holds when the judgment is a judgment by default, which we did not have in the case at bar. *Id.*

██ It is generally true that, although the powers of a court of equity are broad, those powers "are limited to the claim for relief and issues made by the pleadings." *Ruestman v. Ruestman,* 111 S.W.3d 464, 477 (Mo.App.2003) (internal quotation omitted). It is also true, however, that issues not raised by the pleadings may be tried by express or implied consent of the parties and, under those circumstances, such issues shall be treated as if they had been raised in the pleadings. *Wallace v. Grasso,* 119 S.W.3d 567, 575 (Mo.App.2003). Further, if evidence is introduced on an issue without objection, the pleadings may be amended by implied consent. *State ex. rel Moore v. Brewster,* 116 S.W.3d 630, 639 (Mo.App.2003).

During its opening statement, Sunbelt's counsel indicated that he intended to show that the conveyance of the assets from Jiffy Market to OMA was a fraudulent conveyance. Sunbelt's counsel also stated that Sunbelt was asking the trial court to find that Jiffy Market and OMA were the alter egos of each other and to pierce the corporate veil to allow Sunbelt "to collect [its] judgment against not only [OMA], but also Mr. Rieder individually ... as the controlling entity—person behind these corporations."

All parties agree the trust owns the property on which the convenience store (when run as either Jiffy Market or OMA) stands. In addition, the trust owns the fixtures and "hard assets" associated with operating the business; Jiffy Market and OMA were formed as the operating corporations for the business and therefore, did not "own much of anything."

Trustee admitted that he is grantor, as well as trustee, of the trust. According to Trustee, he was the sole shareholder, officer, and director of Jiffy Market, and that the only difference in the business after the dissolution of Jiffy Market and formation of OMA was that he and his wife, to whom he was not married when Jiffy Mar-

ket was formed, were the shareholders of OMA.

Trustee was called as a witness by Sunbelt. During cross-examination by Trustee's attorney, the following exchange occurred:

Q: Charles, you—you understand that this creditor's bill was brought by Sunbelt against the trust?

A: Yes.

Q: Did—This transaction [transfer of assets from Jiffy Market to OMA], has the trust benefited in any fashion?

A: No.

Q: It—It was also brought—The creditor's bill was also brought against you personally. Did you personally benefit in any fashion?

A: No.

■ Because a trust is not a legal entity, and the trustee is the legal owner of the trust property, if a suit is brought that involves the trust property, it is the general rule that all trustees and beneficiaries are considered necessary parties. *Rosenfeld v. Thoele*, 28 S.W.3d 446, 451 n. 8 (Mo.App.2000). Given that general rule, and the evidence before the trial court, including the questioning of Trustee by Trustee's own counsel at the hearing, Trustee's argument that he had no notice of any claim fails.

■ A court of equity, although restrained from deciding an unpleaded fact issue, may grant any relief that is warranted by the pleaded issues regardless of whether or not a particular issue was included in the prayer for relief. *Feinberg*, 924 S.W.2d at 330. The contemporary view of pleading is that the prayer is not part of the petition. *Id.* Therefore, a trial court may grant relief absent an express prayer when such relief is fully supported by the facts that were either pled or tried by consent. *Id.*

Based on the analysis presented in the cited cases, and given the evidence presented as indicated above, there was sufficient evidence for the trial court to include a determination regarding Trustee in its judgment. Point III is denied.

*Point I—Insufficient evidence for trial court to assess liability against Trustee*

*Point II—Insufficient evidence for trial court to assess liability against OMA*

■ Since the evidence presented and the necessary analyses are so intertwined as they relate to Points I and II, we will address the two points together. Within Point I, it is argued that the trial court erred in its interpretation and application of § 428.024, RSMo 2000, as well as common law related to a creditor's bill, in assessing liability against Trustee and obligating him to pay the Sunbelt judgment for services provided to Jiffy Market. Trustee contends there was insufficient evidence to pierce the corporate veil and assess to Trustee the liability of Jiffy Market. Point II makes the same arguments, only as it relates to OMA, rather than Trustee.

All parties agree that § 428.024, RSMo 2000, is our starting point for the analysis of Points I and II. Under § 428.024, RSMo 2000, a transfer "is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1)[w]ith actual intent to hinder, delay, or defraud any creditor or the debtor...." § 428.024.1, RSMo2000; *see also State ex rel. Missouri Highway and Transp. Comm'n v. Overall*, 53 S.W.3d 222, 226 (Mo.App.2001).

Section 428.024.2, RSMo 2000, contains eleven factors that may be given consideration in determining actual intent under

§ 428.024.1, RSMo 2000. In its judgment, the trial court found six of those factors applicable in the case.[1]

> The transfer was to an insider (factor 1);
>
> Mr. Rieder retained control of the property transferred (factor 2);
>
> Prior to the transfer, the debtor had been sued (factor 4);
>
> Substantially all assets were transferred (factor 5);
>
> Less than reasonably equivalent value was received (factor 8);
>
> The debtor was or became insolvent (factor 9); and
>
> The transfer occurred shortly after a substantial debt was incurred (10)

Among the other findings of the court were that subsequent to the jury's verdict and judgment against Jiffy Market for $67,524.20, Jiffy Market transferred substantially all of its assets to OMA; after the transfer, the business continued substantially as before, just under a new name; the transfer from Jiffy Market to OMA was made with the actual intent to hinder, delay, or defraud Sunbelt; Jiffy Market did not receive reasonably-equivalent value for the transfer; and Jiffy Market knew the transfer would leave the corporation unable to pay the judgment Sunbelt had against it. The trial court further found that the piercing of the corporate veil was supported by other abuses, including the co-mingling of corporate and personal assets by Trustee.

"The key elements of a fraudulent conveyance are the conveyance of goods or titles with an intent to hinder, delay, or defraud creditors." *Bueneman v. Zykan,* 52 S.W.3d 49, 54 (Mo.App.2001). The burden of proof is on the creditor, who must prove the case by clear and convincing evidence. *Id.* Fraudulent intent is difficult to establish using direct proof; thus, it is often demonstrated by the surrounding facts and circumstances of the transaction. *Id.*

The circumstances under which Missouri courts will pierce the corporate veil and hold the corporation's owner liable for the corporation's debt are narrow. *Patrick V. Koepke Constr., Inc. v. Paletta,* 118 S.W.3d 611, 614 (Mo.App. 2003). A court may pierce the corporate veil or disregard the separate corporate entity if the separateness is used as a device to defraud a creditor. *Sansone v. Moseley,* 912 S.W.2d 666, 669 (Mo.App. 1995). The existence of a corporate entity will be disregarded when the corporation is operated while undercapitalized or if its assets are stripped to avoid the demands of creditors. *Id.* Further evidence that the corporate identity was used to defraud creditors is the transfer by the debtor corporation of its property to a second corporation, when both corporations are

---

1. Section 428.024.2, RSMo 2000, provides, "In determining actual intent under subdivision (1) of subsection 1 of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the transfer; (3) The transfer or obligation was disclosed or concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

controlled by the same person or entity. *Id.*

■ To pierce the corporate veil, a plaintiff must show:

1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

2) Such control must have been used by the corporation to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest or unjust act in contravention of plaintiff's legal rights; and

3) The control and breach of duty must proximately cause the injury or unjust loss complained of.

*Patrick V. Koepke Constr. Inc.*, 118 S.W.3d at 614–15.

As noted in the discussion of Point III above, Trustee testified that the trust owns the fixtures and hard assets associated with operating the business, and that both Jiffy Market and OMA were formed to serve as the operating corporations for the business. As such, neither of those operating corporations "own[ed] much of anything." There was never a written lease or management agreement between the trust and Jiffy Market; OMA was set up in the same manner.

Trustee also admitted that he was both the grantor and trustee of the trust. According to Trustee, he was the sole shareholder, officer, and director of Jiffy Market, and that the only difference in the business after the dissolution of Jiffy Market and formation of OMA was that he and his wife, to whom he was not married

when Jiffy Market was formed, were the shareholders of OMA.

Trustee testified at the hearing that Jiffy Market had not voluntarily paid any money to satisfy the judgment to Sunbelt. He further testified that Jiffy Market had no intention of paying the debt. According to Trustee, after the initial execution of the judgment, when the Sheriff's Office allegedly seized property that belonged to the trust and Jiffy Market, he caused OMA to be formed and transferred to OMA all of the hard assets Jiffy Market owned, including inventory, fixtures, and office equipment. Trustee admitted that this transfer "[d]idn't leave anything within the shell of [Jiffy Market]...." Trustee caused OMA to be formed so that he could get the store functioning again.

Sunbelt presented evidence to the court of Jiffy Market's tax returns, which purported to show that Jiffy Market owned in excess of one-half million dollars' worth of real estate. Trustee testified that the trust owned all of the real estate, but that the accountant was the one who did all of the calculations and completed the tax forms. Sunbelt noted that it did not present the tax returns to show actual ownership, but to show that assets of Jiffy Market and the trust were co-mingled, and the trial court allowed the evidence for that purpose.

Within the convenience store was a Baskin–Robbins ice cream sales outlet. Trustee testified that after the transfer of the hard assets from Jiffy Market to OMA, the Baskin–Robbins lease was assigned. The assignment was signed by Charles Rieder on behalf of the trust and Jiffy; the lease itself was actually assigned to the trust. No money changed hands for the agreement.

According to counsel representing Jiffy Market, Trustee, and OMA, when OMA was formed, "[i]t purchased the only assets

of" Jiffy Market noted above (office equipment, inventory, shelving). All of these assets were apparently subject to a lien from Ozark Mountain Bank. The lien, however, showed it was to Ozark Mountain Bank by Charles Rieder d/b/a Jiffy Market. A trailer Trustee claimed was seized by Sunbelt was also titled this way, although Trustee testified that he had purchased it individually.

Within the transaction, OMA assumed accounts payable of approximately $33,000, "plus paid an additional $900." Trustee admitted that there was never an attempt made to determine fair market value of the business run as Jiffy Market. There was no transfer of the phone number or of any on-going good will of the business, and, as mentioned previously, nothing paid for the assignment of the Baskin–Robbins lease.

After the transfer of assets to OMA, everything was the same with respect to the business, with the same assets and same creditors, all except Sunbelt. Trustee admitted that the transfer was accomplished so as not to pay the judgment to Sunbelt.

Given the evidence as outlined above, we cannot find that the trial court erred. There was sufficient evidence to pierce the corporate veil of Jiffy Market and OMA, and for the court to find that Jiffy Market, OMA, and Trustee were all "one and the same." Therefore, there was sufficient evidence for the trial court to assess liability for Sunbelt's judgment against Jiffy Market against OMA and Trustee. Points I and II are denied.

### Conclusion

The judgment is affirmed.

PARRISH, J., and BATES, J., concur.